

U.S. DISTRICT COURT
FILED AT WHEELING, WV

AUG 1 2 2010

NORTHERN DISTRICT OF WV
OFFICE OF THE CLERK

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF WEST VIRGINIA
## (MARTINSBURG DIVISION)

| | |
|---|---|
| DOUGLAS N. GAER, Individually And On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>AMERICAN PUBLIC EDUCATION, INC., WALLY BOSTON, Jr., FRANK B. MCCLUSKEY and HARRY T. WILKINS,<br><br>Defendants | CIVIL ACTION NO. 3:10 CV-81<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br><u>JURY TRIAL DEMANDED</u> |

### INTRODUCTION

1.      This is a federal class action on behalf of purchasers of the common stock of American Public Education, Inc. ("APEI" or the "Company") between **February 22, 2010 and August 5, 2010,** inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). As alleged herein, defendants published a series of materially false and misleading statements that defendants knew and/or recklessly disregarded were materially false and misleading at the time of such publication, and that omitted to reveal material information necessary to make defendants' statements, in light of such material omissions, not materially false and misleading.

### OVERVIEW

2.      Defendants issued a series of materially false and misleading statements regarding the growth and foreseeable profitability of APEI throughout the Class Period. During this time,

defendants announced purported strong financial performance and forecasted stable and predictable revenue growth of between 36% and 39% for 2010.

3.      The positive statements regarding the Company's operational performance and future growth projections made by defendants throughout the Class Period, and contained in the Company's press releases and SEC filings, however, were each materially false and misleading when made, and were known by defendants to be false or were recklessly disregarded as such thereby, for the following reasons, among others:

*      At all times during the Class Period, it was not true that the Company's purported success was the result of defendants' competent management when, in fact, throughout the Class Period, defendants had propped up the Company's results by fraudulently inducing students to enroll in APEI's scholastic and educational programs and engaged in other manipulative recruiting tactics which defendants knew, or recklessly disregarded, could not be maintained.

*      At all times during the Class Period, unbeknownst to investors, defendants had materially overstated the Company's growth prospects by failing to properly disclose that defendants had engaged in illicit and improper recruiting activities, which also had the effect of artificially inflating the Company's reported results and future growth prospects.

*      During that time, it was also not true that APEI contained adequate systems of internal operational or financial controls, such that APEI's reported operational statements and foreseeable growth prospects were true, accurate, or reliable.

*      As a result of the aforementioned adverse conditions which defendants failed to disclose, throughout the Class Period, defendants lacked any reasonable basis to claim that APEI was operating according to plan, or that APEI could achieve guidance sponsored and/or endorsed by defendants.

4.      It was only on August 5, 2010, however, that investors learned the truth about APEI after the Company announced that it could no longer maintain its growth expectations or meet guidance sponsored and endorsed by defendants.  On that day, the United States General Accounting Office ("GAO") issued a report that concluded that for-profit educational institutions like APEI had engaged in an illegal and fraudulent course of action designed to recruit students

2

and over-charge the federal government for the cost of such education.   Following these disclosures, shares of the Company collapsed - - falling over $12.00, or almost 30% in the single trading day, on unusually high trading volume.[1]

5.     The damages and losses suffered by plaintiff and other class members were a direct result of defendants' fraudulent scheme to artificially inflate the price of APEI's stock and the subsequent significant decline in the value of the Company's shares when defendants' prior misstatements and fraudulent conduct was revealed.   The artificial inflation of the Company's shares throughout the Class Period and the dramatic decline in the price of Company shares immediately following defendants' belated disclosure is evidenced below:



### JURISDICTION AND VENUE

6.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

---

[1] Shares of APEI collapsed in after-market trading in the afternoon of 8/5/10, and continued to trade lower the following day when the market opened on 8/6/10.

8. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). APEI maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

9. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

10. Plaintiff **DOUGLAS N. GAER**, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of APEI at artificially inflated prices during the Class Period and has been damaged thereby.

11. Defendant **AMERICAN PUBLIC EDUCATION, INC.** is a corporation organized under the laws of the state of Delaware that maintains its principal place of business at 111 West Congress Street, Charles Town, WV 25414. According to the Company's profile listed on *Yahoo.com/finance*, APEI provides online post secondary education to military and public service communities, operating through two universities, American Military University and American Public University, and offering 76 degree programs and 51 certificate programs in various disciplines, such as national security, military studies, intelligence, homeland security, criminal justice, technology, business administration, education, and liberal arts. During the Class Period, the Company had approximately 63,700 students in the United States, the District of Columbia, and other foreign countries.

12. Defendant **WALLY BOSTON, Jr.** ("Boston") is, and during the Class Period was, President and Chief Executive Officer of the Company. During the Class Period, defendant

4

Boston signed and certified the Company's Form(s) 10-K and 10-Q. Also, during the Class Period, while in possession of material adverse, non-public information about the Company, defendant Boston sold over 45,000 shares of his personally held APEI stock to realize gross proceeds of at least $2,016,150.

13.    Defendant **HARRY T. WILKINS** ("Wilkins") is, and during the Class Period was, Chief Financial Officer, Principal Accounting Officer and Executive Vice-President of the Company. During the Class Period, defendant Wilkins signed and certified the Company's Form(s) 10-K and 10-Q. During the Class Period, while in possession of material adverse, non-public information about the Company, defendant Wilkins sold over 13,000 shares of his personally held APEI stock to realize gross proceeds of at least $580,315.

14.    Defendant **FRANK B. McCLUSKEY** ("McCluskey") is, and during the Class Period was, Executive Vice-President and College Provost of the Company. During the Class Period, while in possession of material adverse, non-public information about the Company, defendant McCluskey sold over 29,794 shares of his personally held APEI stock to realize gross proceeds of at least $1,374,780.

15.    The defendants referenced above in ¶¶12-14 are referred to herein as the "Individual Defendants."

16.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of APEI's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their

5

positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to (and were being concealed from) the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

17.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of APEI common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (a) deceived the investing public regarding APEI's business, operations, management and the intrinsic value of APEI common stock; (b) enabled defendants to artificially inflate the price of APEI shares; (c) enabled APEI insiders to sell millions of dollars of their privately held APEI shares while in possession of material adverse non-public information about the Company; and (d) caused plaintiff and other members of the Class to purchase APEI common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of APEI between **February 22, 2010 and August 5, 2010,** inclusive (the "Class"), and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

6

19.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, APEI common shares were actively traded on the Nasdaq.  As of August 3, 2010, the Company had over 18.477 million shares of common stock issued and outstanding.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by APEI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

20.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

21.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

22.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of APEI; and

7

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

23.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Defendants' Materially False and Misleading
### Statements Made During the Class Period

24.     **2009 Results Announced: 2010 Guidance**.  On February 22, 2010, the inception of the Class Period, defendants published a release announcing purported results for full year 2009, ended December 31, 2009, and providing purported guidance for fiscal year 2010.  This release stated, in part, the following:

> Full Year 2009 Revenues Increased 39%; Net Income Increased 48% to $23.9 Million or Approximately $1.27 per Diluted Share Compared to the Prior Year
>
> CHARLES TOWN, W. Va., Feb 22, 2010 (BUSINESS WIRE) -- American Public Education, Inc. (NASDAQ: APEI) - parent company of online learning provider American Public University System (APUS), which operates through American Military University and American Public University - announced financial results for the quarter and year ended December 31, 2009.
>
> Recent Highlights:
>
> •       Net course registrations from new students in the fourth quarter of 2009 increased to approximately 13,700, an increase of approximately 38% over the same period of 2008.
>
> •       Net course registrations increased to approximately 58,000 in the fourth quarter of 2009, a year-over-year increase of 39%.

8

- As of December 31, 2009, a total of approximately 63,800 students were enrolled in American Public University System, a year-over-year increase of 41%.

- Fourth quarter 2009 revenues increased 39% to $43.7 million, compared to $31.5 million in the fourth quarter of 2008.

- Income from operations before interest income and income tax in the fourth quarter of 2009 increased 69% to $14.0 million, compared to $8.3 million in the same period of 2008. Operating margin in the fourth quarter of 2009 increased to 32.0%, compared to 26.3% in the fourth quarter of 2008.

- Net income for the fourth quarter of 2009 increased 66% to $8.4 million or $0.44 per diluted share, compared to $5.0 million or $0.27 per diluted share in the same period of 2008.

- In February 2010, American Public University System received approval from The Higher Learning Commission to offer two new master's degrees, a new bachelor's degree, and 10 new certificate programs.

25.     This release also provided purported guidance for 2010, in part, as follows:

Full Year 2010 and 2011 Outlook:

The following statements are based on current expectations. These statements are forward-looking and actual results may differ materially.

For fiscal year 2010, American Public Education currently estimates the following:

- Net course registrations to increase between 35% and 38% year-over-year

- Revenues to increase between 36% and 39% year-over-year

- Net income to increase between 36% and 37% year-over-year

For fiscal year 2011, the Company currently anticipates net course registrations will increase approximately 32% to 35% year-over-year

26.     **2009 Form 10-K.** Immediately following the publication of this release and as shares of APEI continued to trade at levels artificially inflated by the publication of defendants' false statements, on February 22, 2010, defendants filed with the SEC the Company's 2009 Form 10-K, for the year ended December 31, 2010, signed and certified by defendants Boston and

Wilkins.   In addition to making substantially similar statements concerning the Company

operations as had been published previously, the 2009 Form 10-K also provided statements

concerning the Company's Controls and Disclosure Procedures, in part, as follows:

ITEM 9A. DISCLOSURE CONTROLS AND PROCEDURES

**Evaluation of Disclosure Controls and Procedures**

We have carried out an evaluation, under the supervision and the participation of
our management, including our principal executive officer and principal financial
officer, of the effectiveness of the design and operation of our disclosure controls
and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities
Exchange Act of 1934, as amended, or the Securities Exchange Act), as of
December 31, 2009. Based upon that evaluation, our principal executive officer
and principal financial officer concluded that, as of the end of that period, our
disclosure controls and procedures are effective in providing reasonable assurance
that (a) the information required to be disclosed by us in the reports that we file or
submit under the Securities Exchange Act is recorded, processed, summarized and
reported within the time periods specified in the Security and Exchange
Commission's rules and forms, and (b) such information is accumulated and
communicated to our management, including our principal executive officer and
principal financial officer, as appropriate to allow timely decisions regarding
required disclosure.

27.     **Certifications.**  In addition to the foregoing, the Company's 2009 Form 10-K also

contained certifications by defendants Boston and Wilkins, that attested to the purported

accuracy and completeness of the Company's disclosures, as follows:

**CERTIFICATION**

1.      I have reviewed this annual report on Form 10-K of American Public
Education, Inc;

2.      Based on my knowledge, this report does not contain any untrue statement
of a material fact or omit to state a material fact necessary to make the statements
made, in light of the circumstances under which such statements were made, not
misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial
information included in this report, fairly present in all material respects the
financial condition, results of operations and cash flows of the registrant as of,
and for, the periods presented in this report;

10

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 22, 2010

By:      /s/ Wallace E. Boston
Name:    Wallace E. Boston
Title:   President and Chief Executive Officer

*   *   *

By:      /s/ Harry T. Wilkins
Name:    Harry T. Wilkins
Title:   Executive Vice President and Chief Financial Officer

*   *   *

## CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

The undersigned, the Chief Executive Officer of American Public Education, Inc. ("the Company"), hereby certifies that, to his knowledge, on the date hereof:

a) The annual report on Form 10-K of the Company for the period ended December 31, 2009 filed on the date hereof with the Securities and Exchange Commission ("the Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

b) Information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: February 22, 2010
By:      /s/ Wallace E. Boston
Name:    Wallace E. Boston
Title:   President and Chief Executive Officer

*   *   *

## CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

The undersigned, the Chief Financial Officer of American Public Education, Inc. ("the Company"), hereby certifies that, to his knowledge, on the date hereof:

a) The annual report on Form 10-K of the Company for the period ended December 31, 2009 filed on the date hereof with the Securities and Exchange Commission ("the Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

b) Information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: February 22, 2010
By:     /s/ Harry T. Wilkins
Name:   Harry T. Wilkins
Title:    Executive Vice President and Chief Financial Officer

28.     The statements made by defendants and contained in the Company's February 22, 2010 release and in the Company's 2009 Form 10-K, were each materially false and misleading when made, and were known by defendants to be false or were recklessly disregarded as such thereby, for the following reasons, among others:

(a)     At all times during the Class Period, it was not true that the Company's purported success was the result of defendants' competent management when, in fact, throughout the Class Period, defendants had propped up the Company's results by fraudulently inducing students to enroll in APEI's scholastic and educational programs and engaged in other manipulative recruiting tactics which defendants knew, or recklessly disregarded, could not be maintained;

(b)     At all times during the Class Period, unbeknownst to investors, defendants had materially overstated the Company's growth prospects by failing to properly disclose that defendants had engaged in illicit and improper recruiting activities, which also had the effect of artificially inflating the Company's reported results and future growth prospects;

(c)     Throughout the Class Period, it was also not true that APEI had adequate systems of internal operational or financial controls, such that APEI's reported operational statements and foreseeable growth prospects were true, accurate, or reliable; and

(d)     As a result of the aforementioned adverse conditions which defendants failed to disclose, throughout the Class Period, defendants lacked any reasonable basis to claim

13

that APEI was operating according to plan, or that APEI could achieve guidance sponsored and/or endorsed by defendants.

29.    **1Q:10 Results Announced**.   On May 6, 2010, defendants published a release announcing purported results for the first quarter of 2010, the period ended March 31, 2010. This release stated, in part, the following:

> American Public Education Reports First Quarter 2010 Results
> First Quarter 2010 Revenues Increased 43%; Net Income Increased 46% to $7.6 Million or Approximately $0.40 per Diluted Share Compared to the Prior Year
>
> CHARLES TOWN, W.Va., May 06, 2010 (BUSINESS WIRE) --American Public Education, Inc. (NASDAQ: APEI) - parent company of online learning provider American Public University System (APUS), which operates through American Military University and American Public University - announced financial results for the quarter ended March 31, 2010.
>
> Recent Highlights:
>
> •      First quarter 2010 revenues increased 43% to $47.3 million, compared to $33.2 million in the first quarter of 2009.
>
> •      Net course registrations increased to approximately 64,900 in the first quarter of 2010, a year-over-year increase of 39%.
>
> •      Net course registrations from new students in the first quarter of 2010 increased to approximately 13,300, an increase of approximately 26% over the same period of 2009.
>
> •      As of March 31, 2010, a total of approximately 70,600 students were enrolled in American Public University System, a year-over-year increase of 42%.
>
> •      Income from operations before interest income and income taxes in the first quarter of 2010 increased 50% to $13.1 million, compared to $8.7 million in the same period of 2009.
>
> •      Net income for the first quarter of 2010 increased 46% to $7.6 million or $0.40 per diluted share, compared to $5.2 million or $0.28 per diluted share in the same period of 2009.
>
> •      American Public Education raises full year 2010 net income growth outlook to between 36% and 39% year-over-year.

14

- American Public University System announces a new partnership to provide classes to faculty and other employees of Connections Academy, a leading national operator of K-12 virtual public schools.

30.     In addition to the foregoing, the May 6, 2010 release provided purported guidance for the second quarter and the remainder of 2010, in part, as follows:

Full Year 2010 Outlook:

The following statements are based on current expectations. These statements are forward-looking and actual results may differ materially.

For fiscal year 2010, American Public Education currently estimates the following:

- Net course registrations to increase between 35% and 38% year-over-year

- Revenues to increase between 36% and 39% year-over-year

- Net income to increase between 36% and 39% year-over-year

31.     As shares of APEI continued to trade at levels artificially inflated by the publication of defendants' materially false and misleading results, also on May 6, 2010, defendants filed with the SEC the Company's 1Q:10 Form 10-Q, for the first quarter ended March 31, 2010, signed and certified by defendants Boston and Wilkins.  In addition to making substantially similar statements concerning the Company operations as had been published previously, the 1Q:10 Form 10-Q also provided statements concerning the Company's purported Controls and Disclosure Procedures, in part, as follows:

**Item 4. Controls and Procedures**

Evaluation of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we have evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2010 as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Based upon the evaluation, our Chief

15

Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of March 31, 2010.

Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in reports we file or submit under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commissions rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

32.    **Certifications.**   Similar to the Company's 2009 Form 10-K, the Company's 1Q:10 Form 10-Q also contained certifications by defendants Boston and Wilkins, that again attested to the purported accuracy and completeness of its disclosures, in part, as follows:

### CERTIFICATION PURSUANT TO
### 18 U.S.C. SECTION 1350

In connection with the Quarterly Report of American Public Education, Inc. (the "registrant") on Form 10-Q for the fiscal quarter ending March 31, 2010 as filed with the Securities and Exchange Commission on the date hereof (the "report"), we, Wallace E. Boston, Jr. and Harry T. Wilkins, President and Chief Executive Officer and Executive Vice President and Chief Financial Officer, respectively, of the registrant, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that to our knowledge, on the date hereof:

(1)    The report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)    The information contained in the report fairly presents, in all material respects, the financial condition and results of operations of the registrant.

May 6, 2010
/s/ Wallace E. Boston, Jr.
Wallace E. Boston, Jr.
President and Chief Executive Officer

/s/ Harry T. Wilkins
Harry T. Wilkins
Executive Vice President and Chief Financial Officer

33.     The statements made by defendants and contained in the Company's May 6, 2010

release and in the Company's 1Q:10 Form 10-Q, were also each materially false and misleading

when made, and were know by defendants to be false at that time or were recklessly disregarded

as such thereby, for the reasons stated herein in ¶28, *supra*.

34.     As shares of the Company continued to trade above $40.00 in the late spring of

2010, defendants announced that defendant Boston would present at a series of major investor

conferences, hosted by large investment banks. At these conferences, defendant Boston

purported to guide investors as to APEI's growth strategies, financial performance, and near-

term outlook. Three of these presentations included the following:

*       Defendant Boston presenting at the 2010 Bank of America Merrill Lynch
        Services Conference in New York City, on May 26, 2010.

*       Defendant Boston presenting at the UBS Global Technology and Services
        Conference in New York City, on June 9, 2010.

*       Defendant Boston presenting at the William Blair & Company Annual Growth
        Stock Conference in Chicago, Illinois on June 17, 2010.

## THE TRUE OPERATIONAL CONDITION
## OF APEI IS BELATEDLY REVEALED

35.     Beginning on August 3, 2010, reports began to circulate that questioned the

legitimacy of the means by which for-profit education providers, such as the Company, recruited

students. While no names were initially provided, that day, GAO published a report finding that:

(a) certain for-profit schools used deceptive recruiting practices; (b) certain for-profit schools

substantially inflated their tuition costs; and (c) certain for-profit schools engaged in other

"troubling" practices. Accordingly, that day, Reuters reported, in part, the following:

> WASHINGTON, Aug 3 (Reuters) - U.S. government investigators found that for-
> profit colleges encouraged fraudulent practices and made deceptive statements to
> prospective students, according to a study released on Tuesday.

17

Investigators from the Government Accountability Office posed as students and applied for admission at 15 for-profit colleges across the United States. School personnel encouraged GAO staff to falsify financial aid forms, misled them about costs and gave false information about accreditation.

* * *

GAO's investigators also found that tuition at the for-profit colleges was "substantially more" than for comparable programs at nearby public colleges, but often misled prospective students about total costs.

The study found that a massage therapy program certificate cost $14,000 at a for-profit college but was just $520 at a local community college.

The Career College Association, an organization of mostly for-profit occupational colleges, said in a statement that the GAO report "is deeply troubling" and vowed to strengthen its members' compliance with regulations.

* * *

Investigators found that on average, tuition for an associate's degree was between 6 and 13 times as much at a for-profit school than at a nearby public college. The average of the for-profit schools investigated was $33,467, compared to just over $4,000 for public schools.

A bachelor's degree at a for-profit college averaged $55,000, almost twice as expensive as local public institutions.

* * *

The GAO findings add to pressure the industry, which has already faced a crackdown by the Obama administration.

The U.S. Department of Education proposed rules on July 22 that would force for-profit schools to show their former students are either paying off their loans or are capable of doing so.

36.     Similarly, on August 4, 2010, cable news network, CNBC, also published a report

on its website that stated, in part, the following:

GAO Finds For-Profit Schools Encouraged Fraud

An investigation by the Government Accountability Office (GAO) contends that for-profit colleges encouraged fraud and engaged in deceptive and questionable marketing practices.

The investigation is part of a detailed report released this morning in conjunction with testimony before the Senate Committee on Health, Education, Labor and Pensions by Gregory Kutz, the GAO's managing director of forensic audits and special investigations.

* * *

Kutz made it clear he believed the company's findings suggested the practices were widespread throughout the industry, suggesting to some industry observers that legislators are likely to more tightly regulate the industry.

* * *

Meanwhile Harris Miller, president of the Career College Association, told me the findings are "disturbing." And while the report was expected, "It's hard to put lipstick on a pig. To have four schools have financial aid officers that are advising students to misrepresent their financial situation is totally unacceptable. The necessity to focus on compliance has to be elevated."

37.     Also on August 4, 2010, Senator Dick Durbin, Assistant Majority Leader, posted

on his official website, at http://durbin.senate.gov/showRelease.cfm? releaseId=326961, in part,

the following:

DURBIN, WEBB TAKE CONCERNS ABOUT FOR-PROFIT COLLEGES TO V.A. AND D.O.D.

Wednesday, August 4, 2010

[WASHINGTON, D.C.] – Concerned about reports of some for-profit colleges aggressively targeting military personnel and veterans, U.S. Senators Dick Durbin (D-IL) and Jim Webb (D-VA) today asked the Secretaries of the Department of Veterans Affairs, Eric Shinseki, and the Department of Defense, Robert Gates, for detailed information on how veteran and military tuition assistance program funding is being spent.

Specifically, Durbin and Webb asked for data on the tuition assistance used for education at for-profit colleges and the standards in place to ensure that veterans, service members and their families are given the best possible options for higher education and that taxpayer funding is being well-spent.

"Some for-profit colleges serve VA beneficiaries [and active duty students and their families] well by offering flexible course schedules, distance learning, and course credit for military training," the Senators wrote. "But we have heard reports that some for-profit institutions may be aggressively targeting service

members and veterans, signing them up for educational programs that may bring little benefit to future employment opportunities, low graduation rates and high default rates. Finally, with the recent passage of the Post 9/11 GI Bill, which provides for tuition reimbursement, we have heard concerns about excessive tuition being charged at some of these institutions."

In 2008, Congress passed the Post-9/11 GI Bill, hallmark legislation introduced by Senator Webb on his first day in office, to provide veterans with comprehensive educational benefits on par with the World War II-era GI Bill. More than 34,000 beneficiaries took advantage of the program in fall 2009 – the first year funding was available. Seven of the top ten recipients of Post-9/11 GI Bill funding were for-profit schools.

The United States began providing education benefits to veterans and members of the military in 1944, as part of the Servicemen's Readjustment Act, which was the origin of the GI Bill. Many of these educational opportunities are free or at reduced cost, and offer the flexibility necessary for service members subject to short-notice, worldwide deployments. In 2009, the Department of Defense spent $424 million on tuition assistance and the Department of Veterans Affairs spent $3.58 billion.

On June 21, Durbin joined with other lawmakers in asking the GAO to assess the quality of for-profit institutions, as well as how much of their revenue is comprised of Federal student aid and other Federal funding sources. Other Senators signing on to today's letter include: Senators Tom Carper (D-DE), Kay Hagan (D-NC), Claire McCaskill (D-MO), Russ Feingold (D-WI) and Tom Harkin (D-IA).

38.     As a result of GAO not naming the companies engaged in fraudulent and deceptive registration practices, and because the Company made no adverse disclosures at that time, shares of APEI continued to trade above $44.00 on August 3 and 4, 2010. However, on August 5, 2010, shares of the Company fell almost 30% - - or over $12.00 per share - - after defendants revealed that APEI would no longer be able to sustain its forecast growth. That day, Reuters reported, in part, the following:

American Public says military admissions hit; shares tank

*        Sees Q3 rev growth of 29 pct to 31 pct

*        Says adverse changes to growth from military students

\*      Q2 EPS $0.37 vs est $0.33

\*      Revenue $46.3 mln vs est $46.4 mln

\*      Shares down 28 percent in extended trade

Aug 5 (Reuters) - American Public Education Inc (APEI) said it could no longer rely on its prior full-year outlook, as it observed adverse changes in growth from military students, sending its shares down 28 percent after market.

The company, which provides courses related to military and public service communities, had previously forecast revenue growth of 36 percent to 39 percent for 2010.

American Public said it expects third-quarter revenue growth of 29 percent to 31 percent.

*   *   *

Analysts on average were expecting earnings of 33 cents a share, on revenue of $46.4 million, according to Thomson Reuters I/B/E/S.

Shares of the company were trading down 28 percent at $30.65 after the bell. They closed at $42.67 Thursday on Nasdaq.

39.     In addition to the foregoing, Barron's online similarly reported, in part, the following:

APEI Plunges; Slashes Revenue View As It Backs Off Military Recruits

Shares of for-profit college operator American Public Education (APEI) are off $11.82, or 28%, at $30.85, after the company this afternoon beat Q2 estimates but slashed its revenue growth outlook this year by 25%, saying it expects to tighten up on recruitment of new students.

APEI is one of the company's in the spotlight of regulatory scrutiny of for-profits, as the company derives most of its enrollment from U.S. military personnel. Yesterday, Senator Richard Durbin (Dem., Illinois) and Senator Jim Webb (Dem., Virginia) sent a letter to the Department of Defense and to the Department of Veterans Affairs asking about how funding for education for vets has been spent.

Durbin and Webb note that an undercover Government Accountability Office report presented yesterday indicated some for-profits are "aggressively" trying to recruit military personnel, perhaps irresponsibly.

21

Stating that recruitment of military personnel is experiencing "adverse changes," with more service people appearing to be deployed in the field, the company said that it plans to, "accelerate its existing strategic plan to address civilian markets through APU, with an emphasis on public service professionals and selected groups of working adults."

Hence the company said it would no longer provide a yearly forecast and revoked its existing 2010 forecast. The company said it expects net course registration in the current quarter to be up 20% to 22%, which is down from a prior forecast for up 29% to 31%, and for revenue to rise 29% to 31%, down from a prior view of 40% to 42%.

40.    The Following day, August 6, 2010, Marketwatch also reported that:

SAN FRANCISCO (MarketWatch) -- American Public Education (APEI 29.90, -12.77, -29.93%) shares fell 28%, or $12, to $30.63 Friday after the provider of online higher-education degree programs said it's recently observed "adverse changes" in the pattern of growth of net course registrations from active-duty military students at its American Military University. It revised its forecasts for the third quarter of 2010 and said previous forward-looking expectations "should no longer be relied on.

## CAUSATION AND ECONOMIC LOSS

41.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated APEI's stock price and operated as a fraud or deceit on Class Period purchasers of APEI's stock by misrepresenting the Company's operational results and foreseeable growth prospects.   Over a period of approximately five months, defendants improperly inflated the Company's results and issued false and misleading guidance.  Ultimately, however, when defendants' prior misrepresentations and fraudulent conduct came to be revealed and became apparent to investors, shares of APEI declined precipitously - - evidence that the prior artificial inflation in the price of APEI's shares was eradicated.  As a result of their purchases of APEI stock during the Class Period, plaintiff and other members of the Class suffered economic losses, *i.e.*, damages under the federal securities laws.

42.     By improperly characterizing the Company's operational results and misrepresenting its prospects, the defendants presented a misleading image of APEI's business and future growth prospects.  During the Class Period, defendants repeatedly emphasized the ability of the Company to maintain and sustain its objectives, and consistently reported growth within the range of investor expectations and its historical range.  These claims caused and maintained the artificial inflation in APEI's stock price throughout the Class Period and until the truth about the Company was ultimately revealed to investors.

43.     Defendants' false and materially misleading statements had the intended effect of causing APEI's shares to trade at artificially inflated levels throughout the Class Period -- reaching a Class Period high of almost $49.00 per share on June 21, 2010.

44.     On August 5, 2010, however, as investors learned the truth about the Company, and realized or concluded that defendants had engaged in deceptive and manipulative recruiting that could not be sustained in the face of the federal government investigations, shares of the Company collapsed.  Defendants' belated disclosures had an immediate, adverse impact on the price of APEI shares.

45.     These belated revelations also evidenced defendants' prior falsification of APEI's business prospects due to defendants' false statements.  As investors and the market ultimately learned, the Company's prior business prospects had been overstated as were the Company's results of operations.  As this adverse information became known to investors, the prior artificial inflation began to be eliminated from APEI's share price.

46.     As a direct result of investors learning the truth about the Company on August 5, 2010, APEI's stock price collapsed over 30% in a single trading day, on abnormally high trading volume.  This dramatic share price decline eradicated much of the artificial inflation from

23

APEI's share price, causing real economic loss to investors who purchased this stock during the Class Period.

47.     The decline in APEI's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud being revealed to investors and to the market.  The timing and magnitude of APEI's stock price decline negates any inference that the losses suffered by plaintiff and the other members of the Class was caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to defendants' fraudulent conduct.  During the same period in which APEI's share price fell over 30% as a result of defendants' fraud being revealed, the Standard & Poor's 500 securities index was relatively unchanged.

48.     The economic loss, *i.e.*, damages suffered by plaintiff and other members of the Class, was a direct result of defendants' fraudulent scheme to artificially inflate the price of APEI's stock and the subsequent significant decline in the value of the Company's shares when defendants' prior misstatements and other fraudulent conduct was revealed.  The dramatic decline in the price of Company shares immediately following defendants' belated disclosure is evidenced, in part, by the chart below:



## ADDITIONAL SCIENTER ALLEGATIONS

49.     As alleged herein, defendants acted with scienter in that each defendant knew that

the public documents and statements issued or disseminated in the name of the Company were

materially false and misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements or documents as primary violations of the

federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their

receipt of information reflecting the true facts regarding APEI, their control over, and/or receipt

and/or modification of APEI's allegedly materially misleading misstatements and/or their

associations with the Company which made them privy to confidential proprietary information

concerning APEI, participated in the fraudulent scheme alleged herein.

50.     Defendants were motivated to materially misrepresent to the SEC and investors

the true financial condition of the Company because: (a) it deceived the investing public

regarding APEI's business, operations, management, and the intrinsic value of APEI common stock; (b) it enabled defendants to artificially inflate the price of APEI shares; (c) it enabled APEI insiders to sell over $3,971,245 of their privately held APEI shares while in possession of material adverse non-public information about the Company; and (d) it caused plaintiff and other members of the Class to purchase APEI stock at artificially inflated prices.

51.     The individual defendants liquidated their personally held shares of APEI, during the Class Period, in part, as follows:

| INSIDER SALES DURING THE CLASS PERIOD | | | | |
|---|---|---|---|---|
| Date | Insider | Shares | Sale Price Per Share | Value |
| Jul 26, 2010 | WILKINS HARRY T | 500 | $46.23 | $23,115.00 |
| Jul 23, 2010 | MCCLUSKEY FRANK B. | 14,794 | $45.00 | $665,730.00 |
| Jul 15, 2010 | BOSTON WALLACE E. JR. | 5,000 | $42.60 - $43.83 | $216,000.00 |
| Jul 15, 2010 | WILKINS HARRY T | 2,000 | $43.78 | $87,560.00 |
| Jun 25, 2010 | WILKINS HARRY T | 500 | $45.56 | $22,780.00 |
| Jun 15, 2010 | BOSTON WALLACE E. JR. | 5,000 | $45.46 - $46.14 | $229,000.00 |
| Jun 15, 2010 | WILKINS HARRY T | 2,000 | $45.59 | $91,180.00 |
| Jun 11, 2010 | MCCLUSKEY FRANK B. | 15,000 | $47.27 | $709,050.00 |
| May 25, 2010 | WILKINS HARRY T | 500 | $41.20 | $20,600.00 |
| May 17, 2010 | BOSTON WALLACE E. JR. | 5,000 | $43.74 - $44.93 | $222,000.00 |
| May 17, 2010 | WILKINS HARRY T | 2,000 | $44.86 | $89,720.00 |
| Apr 26, 2010 | WILKINS HARRY T | 500 | $45.61 | $22,805.00 |
| Apr 15, 2010 | BOSTON WALLACE E. JR. | 5,000 | $45.49 | $227,450.00 |
| Apr 15, 2010 | WILKINS HARRY T | 2,000 | $45.27 | $90,540.00 |
| Mar 25, 2010 | WILKINS HARRY T | 500 | $44.73 | $22,365.00 |
| Mar 15, 2010 | WILKINS HARRY T | 2,000 | $44.19 | $88,380.00 |
| Mar 15, 2010 | BOSTON WALLACE E. JR. | 5,000 | $44.34 | $221,700.00 |
| Mar 11, 2010 | BOSTON WALLACE E. JR. | 20,000 | $45.00 | $900,000.00 |
| Feb 25, 2010 | WILKINS HARRY T | 500 | $42.54 | $21,270.00 |

## Applicability Of Presumption Of Reliance:
## Fraud-On-The-Market Doctrine

52.     At all relevant times, the market for APEI's common stock was an efficient market for the following reasons, among others:

(a)     APEI's stock met the requirements for listing, and was listed and actively traded on the Nasdaq national market exchange, a highly efficient and automated market;

(b)     As a regulated issuer, APEI filed periodic public reports with the SEC and the Nasdaq;

(c)     APEI regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     APEI was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

53.     As a result of the foregoing, the market for APEI securities promptly digested current information regarding APEI from all publicly available sources and reflected such information in APEI stock price. Under these circumstances, all purchasers of APEI common stock during the Class Period suffered similar injury through their purchase of APEI common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

54.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of APEI who knew that those statements were false when made.

## BASIS OF ALLEGATIONS

55.     Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of SEC filings by APEI, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

56.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public regarding APEI's business, operations, management and the intrinsic value of APEI common stock; (b) enable defendants to artificially inflate the price of APEI shares; (c) enable APEI insiders to sell millions of dollars of their privately held APEI shares while in possession of material adverse non-public information about the Company; and (d) cause plaintiff and other members of the Class to purchase APEI common stock at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them) took the actions set forth herein.

58.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for APEI's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

59.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

29

continuous course of conduct to conceal adverse material information about the business, operations and future prospects of APEI as specified herein.

60. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of APEI's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about APEI and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of APEI common stock during the Class Period.

61. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (b) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (d) each of these

defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

62.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts.   Such defendants' material misrepresentations and/or omissions were done knowingly or with recklessly for the purpose and effect of concealing APEI's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

63.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of APEI common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of APEI's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired APEI common stock during the Class Period at artificially high prices and were damaged thereby.

64.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that APEI was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their APEI common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

65.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

66.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against Individual Defendants

67.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

68.     The Individual Defendants acted as controlling persons of APEI within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various

32

statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

69.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

70.     As set forth above, APEI and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

      C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

      D.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

      E.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August 12, 2010

_[signature]_

CARL N. FRANKOVITCH (WV Bar #4746)
**FRANKOVITCH, ANETAKIS,**
    **COLANTONIO & SIMON**
337 Penco Road
Weirton, WV 26062
Telephone: (304) 723-4400
Facsimile: (304) 723-5892
Email: carl@facslaw.com

KIM MILLER
**KAHN SWICK & FOTI, LLC**
500 Fifth Avenue, Ste. 1810
New York, NY 10110
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com

LEWIS KAHN
**KAHN SWICK & FOTI, LLC**
206 Covington Street
Madisonville, Louisiana 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com

**Attorneys for Plaintiff**

34

Aug 10 10 11:50a       Neil Rothstein                                330-835-9287              p.2
2010-Aug-10 08:22 MT VISTA HOSPITAL HR 94806417253                                        3/4

### CERTIFICATION IN SUPPORT OF APPLICATION FOR LEAD PLAINTIFF

*Douglas N. Gaev* (name) ("plaintiff") declares, as to the claims asserted under the federal securities law, that:

1. Plaintiff has fully reviewed the facts of the complaint(s) filed in this action alleging violations of the securities laws and plaintiff is willing to serve as a lead plaintiff in this case and all other related cases that may be consolidated with it.

2. Plaintiff did not purchase securities of American Public Education, Inc. at the direction of counsel or in order to participate in a private action under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. During the Class Period, plaintiff has executed transactions in the securities of American Public Education Inc. as follows. See Attached Schedule.

5. In the last three years, plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws, except as indicated herein.

6. Plaintiff will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: *10 August*, 2010

*Douglas N. Gaev*
Plaintiff Signature

Name of Plaintiff: _Douglas N. Graer_

Schedule of Plaintiff's Transaction(s) in: American Public Education Inc.

Purchase(s):

| Date | Units | Price |
|------|-------|-------|
| 07/1/08 | 100 | 39.7640 per share<br>$3,976.40 Total |

Sale(s):

| Date | Units | Price |
|------|-------|-------|