UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF WEST VIRGINIA

AT MARTINSBURG

| | |
|---|---|
| DOUGLAS GAER, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>AMERICAN PUBLIC EDUCATION, INC., et al.,<br><br>                    Defendants. | No. 3:10-cv-00081-JPB<br><br><u>CLASS ACTION</u><br><br>CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

1.     Lead Plaintiffs City of Miami Fire Fighters' and Police Officers' Retirement Trust (the "Retirement Trust") and Douglas Gaer (collectively, "Plaintiffs"), individually and on behalf of a class (the "Class") of all purchasers of the publicly traded common stock of American Public Education, Inc. ("American Public" or the "Company") between February 22, 2010 and August 5, 2010, inclusive (the "Class Period"), by and through their undersigned counsel, bring suit against American Public, Wallace E. Boston, Jr. ("Boston"), and Harry T. Wilkins ("Wilkins") (collectively, "Defendants").

2.     Plaintiffs seek remedies under the Securities Exchange Act of 1934 (the "Exchange Act") as a result of the fraudulent scheme undertaken by the Defendants and the economic loss suffered when the true facts were revealed to the public.  The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

## INTRODUCTION

3.     American Public is a for-profit provider of online post-secondary education that has traditionally focused on providing services to the military and public service communities. American Public University System ("APUS"), wholly owned by American Public, comprises two universities: American Military University ("AMU") and American Public University ("APU").  As a for-profit company, American Public primarily derives its revenues from tuition and related educational payments made by active-duty military and veterans with subsidies from American taxpayers.  The Company charges $250 per credit – or $750 per course – which allows it to receive the maximum reimbursed by U.S. taxpayers without service members having to pay any out-of-pocket tuition.  By contrast, publicly funded community colleges typically offer classes on military bases for as little as $50 a credit.

4.      From the start of the Class Period, and unbeknownst to the market, American Public was under siege.  While the Company, at first blush, appeared to be somewhat insulated from the firestorm of controversy surrounding its for-profit brethren, who are widely accused of defrauding students, the federal government, and stockholders alike, American Public was, in reality, suffering from concealed ills.

5.      Specifically, at the start of the Class Period the Company was enjoying its niche as the market leader in the military-related for-profit education segment while simultaneously expanding its reach in the civilian segment.  Its strictly online approach to education, coupled with its immensely profitable focus on U.S. military personnel, gave American Public a steady stream of military students and made it capable of reporting rapid yet predictable growth.  By claiming to take a hands-off approach to military student recruiting and claiming to rely primarily on referrals, the Company was largely able to grow while avoiding being saddled with the controversy that has enveloped for-profit colleges.

6.      The Company's military focus provided it with another benefit:  it was in no danger of running afoul of the "90-10 rule."  According to the U.S. Department of Education, "the 90-10 rule states, simply, that a for-profit institution of higher education may not receive more than 90% of its revenue from federal Title IV [of the Higher Education Act] grants and loans."  The 90-10 rule was intended to function as a measure of the quality of an institution.  As the Department of Education states, "The theory behind it is that if a college is deriving no more than 90% of its revenue from Title IV, it is a quality institution that is able to attract students willing to invest some portion of their own funds in the institution and the education it provides."

7.      Because American Public focused on active military members as its core student population, it historically received a vast majority of its federal tuition assistance funding from the U.S. Department of Defense ("DoD"), as well as from the Department of Veterans Affairs ("VA").

Importantly, neither DoD nor VA benefits originate through Title IV; money received through these programs is not counted as federal financial aid. Thus, it is not subject to the 90-10 rule – tuition payments to for-profit schools by the military do not count toward the 90 percent ceiling. The Department of Education's 90-10 rule effectively considers DoD and VA funds as non-federal aid by allowing these funds to be counted in the 10 percent of the calculation, despite the fact that the money does indeed come from federal taxpayers.

8.      Recognizing the opportunity that military and veterans students provided to escape the strictures of the 90-10 rule while still being able to receive federal taxpayer dollars, American Public's competitors dramatically stepped up their military and veterans student recruitment activities. The result was that during the Class Period, American Public's market leading position as "the" for-profit provider to the U.S. military was under assault from a host of for-profit companies, including Bridgepoint Education, Inc. ("Bridgepoint"), DeVry, Inc. ("DeVry"), ECPI Colleges, Inc. ("ECPI"), Kaplan Higher Education ("Kaplan"), Education Management Corp. ("EMC"), and Strayer Education, Inc. ("Strayer").[1] Indeed, comparing DoD benefits received in 2009 and 2010, Bridgepoint increased its benefits received by *2,038%*, DeVry jumped *3,987%*, ECPI gained *98%*, Kaplan rose *112%*, and Strayer climbed *25%*. By contrast, American Public saw a *15%* increase in DoD benefits received in 2010 when compared to 2009.

9.      Considering the total of both 2009 and 2010 DoD and VA benefits, the gains made by American Public's competitors were equally staggering, including the following increases: Bridgepoint by *1,188*%; DeVry by *3,920%*, ECPI by *573%*, EMC by *2,472%*, Kaplan by *371%*, and Strayer by *279%*. By contrast, American Public saw a *21%* increase in total military education

_____

[1] Kaplan is owned by the Washington Post Company ("WPO").

benefits received between 2009 and 2010.  These numbers demonstrate a simple truth:  American Public's market leading position was under attack by its competitors during the Class Period.

10.     Throughout the Class Period, however, Defendants issued materially false and misleading statements regarding the Company's business, financial results, expected financial performance, and expected growth in student registration.  For example, at the start of the Class Period Defendants touted net course registration increases of 41% for 2009 and expected 2010 net course registration increases between 35% and 38%, pointing to its status as the "largest provider of higher-education to active-duty military, with tremendous visibility and strong relationships within the military community."  Defendants also assured the market that the Company stayed "on top of" military deployment rates and had "already taken that into account" and "buil[t] that into our forecast."  When it came to market share, Defendants told investors that American Public had "continued to gain share in every branch of service; even if we're number one, that we're still continuing to gain actual share inside the military."

11.     Defendants also misled market commentators regarding the market's concern that the Company's competitors were pursuing students from American Public's core military market. Following a meeting with American Public management, on March 26, 2010, Morgan Stanley issued an analyst report that stated, in part, "Management noted there has been ***no change*** in the competitive environment within the military segment despite concerns that other for-profits would step up their efforts in this market to thwart 90-10 issues."

12.     As a result of these and similar false statements during the Class Period, American Public's stock traded at artificially inflated prices, reaching a high closing price of $48.00 per share on June 21, 2010.  The three top officers of American Public took advantage of this inflation, selling almost $4 million of their American Public stock.

- 4 -

13.     The Company's stock declined $2.12 per share on August 5, 2010, following: (i) the U.S. Government Accountability Office ("GAO") report released on August 4, 2010, and entitled "For-Profit Colleges: Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices," that questioned the practices of for-profit schools; and (ii) an August 4, 2010 press release by several prominent U.S. Senators revealing that American Public was under scrutiny and highlighting reports that other for-profit companies, which included American Public's largest competitors, were "aggressively targeting military personnel," American Public's core source of revenues.

14.     After the market closed on August 5, 2010, American Public shocked the market when it issued its second quarter 2010 earnings results, drastically slashing its recently reaffirmed revenue and earnings guidance for the third quarter of 2010 and withdrawing its guidance for the 2010 full fiscal year.  Previously, American Public had provided guidance for the full 2010 fiscal year of an increase in net course registrations to between 35% and 38%, revenue to increase between 36% and 39%, and net income to increase between 36% and 39% year over year.  Despite the fact that Defendants previously told investors that the Company was "on top of" and had built military deployment figures into its forecast, the earnings press release blamed the abrupt shift in financial condition on a sudden decline in course registration from active duty military students as a result of increased military deployments, and provided in pertinent part:

> American Public Education has recently observed adverse changes in our historical pattern of growth in net course registrations from active duty military students at AMU. While the Company cannot determine all of the factors that are causing it to occur, American Public Education believes the changes in net course registrations from active duty military students may in part be due to increased operations activity and recent deployments across all branches of the U.S. Military, particularly the United States Marine Corps. The Company believes that increased demands on many active duty military personnel, combined with limited internet access associated with some deployments in Afghanistan and at sea, are likely to limit the ability of certain active duty military students to pursue higher education in the near term. The Company cannot determine whether net course registrations from active duty

military students will return to previous expectations, grow more slowly than expected, remain flat or decline.

As a result, American Public University Systems plans to accelerate its existing strategic plan to address civilian markets through APU, with an emphasis on public service professionals and selected groups of working adults.

***American Public Education is revising guidance for the third quarter of 2010 and is returning to its prior practice of only providing guidance for current periods. Guidance given previously for 2010 and beyond should no longer be relied upon. American Public Education anticipates third quarter 2010 net course registrations to increase between 20% and 22%, revenue to increase between 29% and 31%, and net income to increase between 5% and 10% over the prior year period.***

15.     Although Defendants still did not admit to the market the true cause of the Company's dwindling active-military growth, on August 5, 2010, they did reveal the Company's true financial condition.  On this news, the price of American Public stock plummeted ***32%***, or $13.71 per share, to close at $28.96 per share on August 6, 2010, on volume of 6.1 million shares, more than ***32 times*** the average three-month daily volume.  The shocking disclosures led analysts to suggest there had been a "loss of management credibility."

16.     The true facts, which were known by the Defendants but concealed from the investing public during the Class Period, were as follows:

(a)     The Company's market-leading status as a provider for educational services to the U.S. military was materially threatened and weakened throughout the Class Period because, in an effort to avoid violating the 90-10 rule, American Public's competitors had substantially increased their military and veterans related business;

(b)     The Company's enrollments had slowed significantly and American Public's business was being adversely affected by increased competitive pressures;

(c)     Federal investigations into the sales and recruitment practices by the for-profit college industry were uncovering fraudulent, deceptive, or otherwise questionable marketing practice and were likely to lead to changes in policies that would inhibit American Public's growth; and

- 6 -

(d)     As a result of the foregoing, Defendants' statements regarding the Company's business, financial performance and revenue and earnings guidance for 2010 were false and misleading and lacked a reasonable basis when made.

17.     As a result of Defendants' false statements and omissions, American Public's common stock traded at artificially inflated prices during the Class Period.  After the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down nearly 40% from their Class Period high.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

20.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  American Public maintains offices in this District and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

21.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

22.     Plaintiffs the Retirement Trust and Gaer each purchased American Public common stock on the open market during the Class Period, as set forth in their certifications previously filed with the Court.  On November 10, 2010, the Court appointed the Retirement Trust and Gaer as Lead Plaintiffs in this action.

23.    Defendant American Public is Delaware corporation with its principal place of business located at 111 West Congress Street, Charles Town, West Virginia 25414.

24.    Defendant Boston is, and at relevant times was, President, Chief Executive Officer ("CEO") and a director of American Public.  During the Class Period, Boston reaped more than $2.0 million in insider trading proceeds by selling 45,000 shares of his American Public stock at artificially inflated prices.

25.    Defendant Wilkins is, and at relevant times was, Chief Financial Officer ("CFO") and Executive Vice President of American Public.  During the Class Period, Wilkins reaped $491,935 in insider trading proceeds by selling 11,000 shares of his American Public stock at artificially inflated prices.

26.    Defendants Boston and Wilkins (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of American Public's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein.

**THE INDIVIDUAL DEFENDANTS' ACCESS TO CRITICAL INFORMATION**

27.    The Individual Defendants were privy to confidential and proprietary information concerning American Public, its operations, finances, financial condition, and present and future

business prospects.  The Individual Defendants also had access to material adverse non-public information concerning American Public, as discussed in detail below.  Because of their positions with American Public, the Individual Defendants had access to non-public information about its business, finances, enrollment, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or were severely reckless in disregarding the fact that adverse facts specified herein had not been disclosed to, and were being concealed from (in order to mislead), the investing public.  The adverse information about American Public's deteriorating competitive position and its slowing military enrollments was central to the Company's business and is the type of information Defendants would have analyzed weekly, if not daily.

28.     Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases, and other statements prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  The Individual Defendants were also able to, and did, directly or indirectly, control the conduct of American Public's business, the information contained in its filings with the SEC, and its public statements.  Moreover, the Individual Defendants made or directed the making of affirmative statements to the investing public, and participated in meetings, conference calls, and discussions concerning such statements. Each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations

that were being made were then false and misleading.  As a result, each of the Individual Defendants is responsible for the accuracy of American Public's corporate releases detailed herein and is therefore responsible and liable for the misrepresentations and omissions contained therein.

29.     The Individual Defendants are liable as direct participants and co-conspirators with respect to the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of American Public's business.

30.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

31.     As senior executive officers and/or directors and controlling persons of a publicly traded company whose common stock and other securities were, and are, registered with the SEC pursuant to the Exchange Act, and whose shares traded on NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to American Public's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of American Public's common stock would be based

upon truthful and accurate information.   The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

32.   The Individual Defendants are liable as primary participants in a fraudulent scheme and wrongful course of business which operated as a fraud or deceit on purchasers of American Public common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.   The fraudulent scheme employed by the Individual Defendants was a success, as it:  (i) deceived the investing public regarding American Public's prospects and business; (ii) artificially inflated the price of American Public common stock; and (iii) caused Plaintiff and other members of the Class to purchase American Public common stock at inflated prices and suffer losses when the relevant truth regarding American Public's true financial condition was revealed and the artificial inflation was removed from the price of the stock.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

33.   Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about American Public.   Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of American Public common stock was a success, as it: (i) deceived the investing public regarding American Public's prospects and business; (ii) artificially inflated the prices of American Public common stock; (iii) allowed Defendants to be paid millions of dollars in incentive awards based in part on American Public's purported success; (iv) allowed Boston and Wilkins to sell approximately $2.5 million worth of their American Public stock at artificially inflated prices; and (v) caused Plaintiffs and other members of the Class to purchase American Public common stock at inflated prices and suffer damages when the artificial inflation was removed at the end of the Class Period.

## CLASS ACTION ALLEGATIONS

34.   Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons who purchased or

otherwise acquired American Public common stock during the Class Period.  Excluded from the

Class are Defendants and their families, the officers and directors of the Company, at all relevant

times, members of their immediate families and their legal representatives, heirs, successors or

assigns and any entity in which Defendants have or had a controlling interest.

35.     The members of the Class are so numerous that joinder of all members is

impracticable.  The disposition of their claims in a class action will provide substantial benefits to

the parties and the Court.  As of August 5, 2010, the last day of the Class Period, American Public

had nearly 18.5 million shares of stock outstanding, owned by hundreds if not thousands of persons.

36.     There is a well-defined community of interest in the questions of law and fact

involved in this case.  Questions of law and fact common to the members of the Class which

predominate over questions which may affect individual Class members include:

(a)     Whether Defendants violated federal securities laws as alleged herein;

(b)     Whether Defendants' publicly disseminated press releases and statements

during the Class Period omitted and/or misrepresented material facts;

(c)     Whether Defendants breached any duty to convey material facts or to correct

material facts previously disseminated;

(d)     Whether Defendants participated in and pursued the fraudulent scheme or

course of business complained of;

(e)     Whether Defendants acted willfully, with knowledge or recklessness, in

omitting and/or misrepresenting material facts;

(f)     Whether the market prices of American Public common stock during the Class

Period were artificially inflated due to the material nondisclosures and/or misrepresentations

complained of herein; and

(g)     Whether the members of the Class have sustained damages as a result of the decline in value of American Public stock when the truth was revealed and the artificial inflation came out, and if so, what is the appropriate measure of damages.

37.     Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

38.     Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Plaintiffs have no interests that conflict with those of the Class.

39.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## BACKGROUND

40.     American Public is a for-profit company that provides exclusively online post-secondary education with emphasis on the needs of the military and public service communities through two universities, AMU and APU.  The Company offers degree and certificate programs in various disciplines, including national security, military studies, homeland security, criminal justice, business administration, education and liberal arts.  Located in Charles Town, West Virginia, American Public was formed in 1991 and converted to an online format in 1998.  American Public went public in November 2007, at $20 per share.  According to the Company, it serves more than 63,700 students living in all 50 states, the District of Columbia, and many foreign countries.

41.     Prior to the start of the Class Period, American Public's course enrollments, or net course registrations, representing the aggregate number of classes in which students remain enrolled after the date by which they may drop the course without cost, increased at a compound annual growth rate (CAGR) of 48% from 2007 to 2009.  Over that same time, the Company's total revenue increased at a CAGR of 47%, from $69.1 million in 2007 to $149.0 million in 2009.  Net course

registrations increased by 55% in 2009 over 2008, and revenue increased from $107.1 million to $149.0 million, or by 39%, over the same time period and operating margins increased to 26.8% from 24.0% over the same time period.  Put simply, leading up to the start of the Class Period, American Public experienced substantial growth and in net course registrations and revenue.

42.     With the ongoing wars in Afghanistan and Iraq, over the past few years Congress has focused on its commitment to providing educational benefits to military veterans.  On June 30, 2008, Congress passed the Post-9/11 Veterans Educational Assistance Act of 2008 ("Post-9/11 GI Bill"), which provides that almost all service members, including reserve troops who serve a minimum of 90 days active duty after September 10, 2001, are eligible for educational benefits up to 36 months at an average of $458 per credit hour.  Additionally, the Post-9/11 GI Bill created a uniform method to pass on or share the educational benefit with spouses and children.  The bill was intended as an improvement on the main benefit package available prior to 2009, the 1985 Montgomery GI Bill, which generally provided benefits only to those who served at least three years active duty and contributed $1,200 of their own money during the first two years of service.

43.     In 2008, Congress also expanded the existing aid available to active duty service members through the DoD tuition assistance program by creating the Military Spouse Career Advancement Accounts ("MyCAA") program for military spouses.  The Post-9/11 GI Bill also allowed active duty service members to combine the newly available benefits with the DoD tuition assistance benefits through an existing "Top-Up" program.  By providing increased financial support and raising public awareness, the Post-9/11 GI Bill has lowered financial barriers for veterans seeking higher education and has encouraged higher education institutions to better focus on the needs of returning veterans.  Colleges across the country have responded by increasing their outreach and support services for current and former service members and their spouses.  As set forth below, American Public's for-profit competitors, fueled by their ability to avert the 90-10 rule and grab

students funded by the increased military benefits created by the Post-9/11 GI Bill, aggressively targeted active-duty military students and their families before and during the Class Period.

44.     Although American Public first became eligible to use Title IV funds beginning with classes that started in November 2006, for the year ended December 31, 2009, 18.7% of the Company's net course registrations were from students using financial aid under Title IV programs. Thus, the vast majority of the Company's net course registrations and revenue is from students using DoD and VA tuition assistance, which, as set forth above, does not count as federal taxpayer money received pursuant to the 90-10 rule.  Put simply, active-duty military students were the bedrock of the Company's revenues.

45.     As American Public made focused on active-duty military and veterans – as opposed to civilians – with subsidies from American taxpayers, its for-profit competitors traditionally did the opposite.  The staggering growth of for-profit schools – whose enrollment increased 236 percent between 1998-99 and 2008-09 – led to an explosion in Title IV lending, hitting $4.3 billion in Pell Grants in the 2008-09 academic year, with an additional $20 billion in federal student loans.  The result was that leading up to and during the Class Period, American Public's competitors received a substantial majority of their revenues from Title IV funds and were coming dangerously close to violating the 90-10 rule.

46.     In the wake of the enormous federal payouts to for-profit schools, whose breakneck growth rates vastly outpaced their public and private (nonprofit) counterparts, during the Class Period, the for-profit education industry fell under ever-increasing scrutiny on a variety of fronts – from extremely low graduation rates to excessively high student loan default rates.  For example, on June 10, 2010, Senator Tom Harkin, chair of the U.S. Senate's Health, Education, Labor and Pensions Committee, announced that he would be holding a series of hearings to examine federal spending at for-profit colleges.  The press release provided in pertinent part:

Senator Tom Harkin (D-IA), Chairman of the Health, Education, Labor and Pensions (HELP) Committee, today announced that he plans to hold a series of hearings to examine federal education spending at for-profit higher education institutions. The hearings will begin June 24th.

"In the past two years we have made major new investments to expand federal financial aid," said Harkin. "Pell Grants and student loans now provide more than $20 billion to for-profit higher education companies every year. We need to ensure for-profit colleges are working well to meet the needs of students and not just shareholders. We owe it to students and taxpayers to make sure these dollars are being well spent."

Between 1998 and 2008 the for-profit sector has grown from 550,000 students to 1.8 million, a 225 percent increase. Students at for-profit institutions are borrowing more, and more frequently, than their peers at non-profit schools, and according to the Department of Education, one in five students who left a for-profit college in 2007 defaulted on their loan within three years.

The Committee will examine a broad range of issues related to the growing role of the for-profit higher education sector, including the scope and rapid growth of the federal investment in for-profit higher education and the corresponding opportunities and risks for students and taxpayers. Details on the first hearing will be available in the coming weeks.

47.     On June 16, 2010, the U.S. Department of Education announced that it was proposing new tougher regulations on the industry designed to protect college students and taxpayers from abusive or fraudulent practices.

48.     On June 24, 2010, the Senate held the first of its hearings entitled "Emerging Risk? An Overview of the Federal Investment in For-Profit Education." Then, on July 23, 2010, the U.S. Department of Education proposed a measure to penalize for-profit colleges for graduating students with high debt-to-income ratios. That same day, *Dow Jones Business News* issued an article entitled "US to Watch Students' Loan Debt at For-Profit Schools," which stated:

The U.S. Department of Education on Friday proposed a measure to penalize for-profit career colleges for graduating students with high debt-to-income ratios.

The proposal, which will undergo a 45-day comment period and is expected to face opposition from industry lobbyists, is an effort to ensure schools are training students for gainful employment in a recognized occupation. It comes as for-profits are under heightened scrutiny as they capture a growing share of federal student-aid dollars.

"Some proprietary schools have profited and prospered, but their students haven't," Secretary of Education Arne Duncan said. "While career colleges play a vital role in training our work force to be globally competitive, some of them are saddling students with debt they cannot afford in exchange for degrees and certificates they cannot use."

Under the proposal, training programs at for-profit schools would be judged on whether former students are repaying the principal on federal loans, and the relationship between total student-loan debt and average earnings upon graduation. The recommendation sets up three tiers of eligibility, with those in the middle tier facing enrollment restrictions and debt-to-income disclosure requirements, and the weakest tier losing access to federal student aid for new students.

According to the Education Department, if career colleges made no changes, 5% of all programs would no longer be eligible for federal aid and 55% would be required to warn students about high debt-to-income ratios. Many publicly traded school operations, including University of Phoenix parent Apollo Group Inc. (APOL), Corinthian Colleges Inc. (COCO) and ITT Educational Services Inc. (ESI), derive close to 90% of their revenue from federal aid.

The recommendation, known as a Notice of Proposed Rulemaking, has been a long time coming, with federal officials and industry representatives meeting for a year to discuss new higher-education regulations. The government put forth its first proposal in late January, and the stocks of for-profit colleges have soared and swooned since, propelled by rumors of how programs could gain exemption from the regulation.

The Education Department said this version is "thoughtful," with income calculations based on actual graduate earnings rather than Bureau of Labor Statistics figures. To give time for program improvement, the agency proposed that the 2012-2013 academic year be the earliest that programs could be found ineligible for federal aid.

Still, that may not be enough. The main lobbyist for trade schools, the Career College Association, lashed out in a press release late Thursday, calling the proposed metrics "unwise, unnecessary, [and] unproven." The group also said it may be unlawful, alleging the Education Department doesn't have the authority to impose the measure.

Analysts say that Career Education Corp. (CECO) and Education Management Corp. (EDMC), with their culinary and art-and-design programs, and ITT, with relatively high tuition, could be most exposed under the new proposal. ***American Public Education Inc. (APEI), known for its inexpensive classes***, and Capella Education Co. (CPLA), which has higher-end graduate programs, ***are considered safer***.

The Education Department had released 13 other proposals in June but said it needed more time for this one. The earlier recommendations included proposals on incentive compensation for student recruiters, a clearer definition of a credit hour and a new metrics by which students must show academic progress in order to continue receiving federal aid.

49.     On August 4, 2010, the U.S. GAO issued a report with its findings from an undercover operation on recruiting techniques used in the for-profit higher education industry.  At the request of Congress, the GAO engaged in its investigation to determine if for-profit colleges engaged in fraudulent, deceptive or otherwise questionable marketing practices.  The GAO's report cited many instances of abuse in the sector, finding that many of the companies in the industry employed fraudulent and deceptive practices in their student recruitment, targeting students who used federal financial aid to pay for their schooling.  The study was presented at a Senate education hearing held on August 4, 2010 as part of an ongoing inquiry into the for-profit sector.

50.     Describing the GAO report and related Congressional hearings, *Businessweek* published the following article on August 4, 2010, which stated, in part:

> Senator Tom Harkin will request information from 30 U.S. for-profit colleges and consider new legislation for the sector after a government investigator described fraud, lying and high-pressure sales tactics used by education-industry recruiters, the Iowa Democrat said today.
>
> Harkin, chairman of the U.S. Senate Health, Education, Labor and Pensions committee, said he will ask publicly traded and closely held companies to disclose graduation rates, loan defaults among former students and recruitment practices.  He called for more hearings as early as September, and said a legislative package may be possible by the end of the year.
>
> President Barack Obama proposed rules that would limit eligibility for financial aid and crack down on enrollment practices at for-profit colleges, which received $26.5 billion in U.S. loans and grants in 2009.  A Government Accountability Office investigation released today detailed practices at Phoenix-based Apollo Group Inc.'s University of Phoenix; the Washington Post Co.'s Kaplan College; Santa Ana, California- based Corinthian Colleges Inc.'s Everest College; and Pittsburgh-based Education Management Corp.'s Argosy University among 15 colleges observed by undercover agents posing as students.   The report showed that more stringent measures than those proposed by the administration may be necessary to clean up the industry, Harkin said at the hearing in Washington.
>
> 'Bad Apples'
>
> "Are we talking about a few bad apples or are we talking about the entire orchard being contaminated by a business model that churns students, that provokes the kind of recruitment and unethical conduct we saw in the GAO, because of a need to increase profits?" Harkin said.

*Democratic Senators Richard Durbin of Illinois and Jim Webb of Virginia said they have asked for information from the Departments of Defense and Veterans Affairs about how military tuition assistance program money is being spent to pay for education expenses at for-profit colleges. Durbin and Webb said in an e-mail they want to ensure that "veterans, service members and their families are given the best possible options for higher education and that taxpayer funding is being well- spent."*

51.     Recognizing the opportunity to avoid violating the 90-10 rule afforded them by active-duty military and veterans – as well as the increased funding made available by the Post-9/11 GI Bill – the Company's competition had aggressively pursued military and veteran students prior to and during the Class Period in an effort to bolster the 10 percent side of the 90-10 calculus.  Put simply, enrolling veterans and service members allows for-profit schools to expand the number of non-military students that they enroll.  If a for-profit company can generate $10 million in revenue from VA and DoD benefits, it can take in another $90 million in student loan and Pell Grant funds without inching any closer to violating the 90-10 rule.

52.     American Public's market-leading position in the military for-profit education segment was under fire during the Class Period.  Defendants knew and/or deliberately disregarded that, prior to and during the Class Period, American Public's competitors had grown increasingly focused on expanding their military student enrollment: military students provided them an easy resolution for increased concern over the 90-10 rule.  In addition to issues surrounding the 90-10 rule, for-profit institutions were facing widespread scrutiny over their use of Title IV funds, and the Post-9/11 GI Bill had increased the funding available to military students for education.  This rising competition for military students dragged down the Company's ability to grow military course registrations, and competitors such as Bridgepoint, DeVry, ECPI, Kaplan, and Strayer gobbled up more DoD and VA benefits than ever before.  Indeed, although at the close of the Class Period the Post-9/11 GI Bill had been in effect for only one year, its benefits have been aggressively pursued by for-profit schools.  The thirty for-profit schools that have responded to federal document requests in

August 2010 reported 23,766 students receiving military benefits of any type in 2006, but 109,167 students receiving benefits in 2009, and 100,702 students through approximately the first half of 2010.

53.     Although, as set forth above, American Public was considered to be "safer" from regulation when compared to its for-profit counterparts, it was not immune from scrutiny.  On August 4, 2010, U.S. Senators Dick Durbin, Jim Webb, Tom Harkin, and others, issued a press released containing the contents of letters sent to Defense Secretary Robert Gates ("Gates") and Secretary Eric K. Shinseki asking questions about the federal investment in for-profit colleges in light of reports that some for-profit colleges have been aggressively targeting military personnel and veterans.  Not only did the August 4, 2010 letters and press release reveal that American Public was under scrutiny, they highlighted reports that other for-profit institutions, which included American Public's competitors, had been "aggressively targeting military personnel," American Public's core source of revenues.  The letter to Gates, read, in part:

> Dear Secretary Gates:
>
> *We write regarding federal education support programs benefiting service members and their dependents.  Specifically, we are concerned about the growing predominance of for-profit colleges and universities in these programs and the lack of information available about the quality of education provided by these institutions to active-duty personnel, dependents, and veterans.*
>
> Enrollment at for-profit colleges and universities has grown by 225% over the past ten years.  Some for-profit institutions serve active-duty students and their families well by offering flexible course schedules, distance learning, and course credit for military training.  *But we have heard reports that some for-profit institutions may be aggressively targeting military personnel, signing them up for educational programs that may bring little benefit to future employment opportunities, and low graduation rates*.  Finally, with the recent passage of the Post 9/11 GI Bill, which provides for tuition reimbursement, we have heard concerns about excessive tuition being charged at some of these institutions.
>
> We ask you to review your Department's voluntary education programs and provide us the following:
>
> •     DoD tuition assistance expenditure data for each of the last ten years, including information on for-profit colleges that have received tuition

assistance, the number of students who have enrolled at each for-profit college, and the total amount of funding disbursed to these colleges by program.

- Information regarding the standards, aside from accreditation by a Department of Education recognized agency, used to establish the eligibility of for-profit educational institutions to provide education through, and reimbursed by, DoD tuition assistance programs.

- Information regarding the standards used to establish eligibility of for-profit colleges to engage in on-base recruiting activities, including current requirements and limitations placed on colleges, regulations relating to inducements for students, including laptops or other gifts, and college counseling resources and practices.

- Information on the quality of education programs at for-profit colleges, including costs of tuition, graduation and drop-out rates, number of students for whom graduation and drop-out information is unknown, job placement rates, accreditation status of schools and programs, student loan default rates, number of students that transfer from one institution to another, and acceptance of credit transfers by other institutions of higher education.

- Information on incidents of misrepresentation or fraud on the part of for-profit colleges and any complaints regarding aggressive or deceptive marketing, poor quality coursework, unexpected costs, or inability to obtain promised employment.

- Information on the systems in place to ensure quality of academic programs as well as any examples of for-profit institutions being barred from participating in voluntary education programs because of poor class quality, fraud, or for any other reason.

- Finally, we would appreciate information regarding any program changes you or the services are considering to ensure that only quality academic institutions are involved in voluntary education programs.

54.     As described in the August 4, 2010 press release and the letter sent to Secretary Gates, in the first year that Post-9/11 GI Bill funding was available, more than 34,000 beneficiaries took advantage of the program, and seven of the top ten recipients of this funding were for-profit schools.   These for-profit institutions, including American Public's competitors, had been aggressively targeting active-duty military students and families before and during the Class Period by offering "flexible course schedules, distance learning, and course credit for military training."

- 21 -

55.     Then, following the close of the Class Period, on December 8, 2010, the U.S. Senate
Health, Education, Labor and Pensions Committee issued a report entitled "Benefitting Whom?  For-
Profit Education Companies and the Growth of Military Education Benefits."  The report included a
list of for-profit colleges with their respective military education benefits received, showing
American Public as receiving more military education benefits that any other school.  The report
called into question the volume of federal money going to military education at for-profit schools,
and stated, in part:

- Serious questions have emerged about the share of the military educational
benefit pool going to for-profit schools with questionable outcomes.
Congress may have unintentionally subjected this new generation of veterans
to the worst excesses of the for-profit industry: manipulative and misleading
marketing campaigns, educational programs far more expensive than
comparable public or nonprofit programs, and a lack of needed services.

*     *     *

- Between 2006 and 2010, combined VA and DoD education benefits received
by 20 for-profit education companies increased from $66.6 million in 2006 to
a projected $521.2 million in 2010, an increase of 683 percent:

  o  Between 2009 and 2010 alone, revenue from military educational
benefits at 20 for-profit education companies increased 211 percent.

  o  In the first year of Post-9/11 GI Bill implementation, the VA spent
comparable amounts ($697 million and $640 million respectively) on
tuition for students attending public schools and students attending for-
profit schools, but the VA funded 203,790 students at public schools
compared to 76,746 at for-profits.

  o  Revenue from DoD educational programs at 18 for-profit education
companies increased from $40 million in 2006 to an expected $175.1
million in 2010, a 337 percent increase.

  o  Revenue from VA educational programs for the same 18 for-profit
education companies increased from $26.3 million in 2006 to an expected
$285.8 million for 2010, including a fivefold increase between 2009 and
2010.

  o  Revenues from military education benefits at 20 for-profit education
companies increased more rapidly than overall revenues for every year
between 2006 and 2010.

- 22 -

- The expansion of military benefits have made service members, veterans, spouses and family members highly attractive prospects to for-profit schools seeking to rapidly increase enrollments to satisfy the demands of investors.

                    *        *        *

- Outcomes at the for-profit schools receiving the most military educational benefit revenue are questionable.

    o Four of the five for-profit schools receiving the most Post-9/11 GI Bill funding in the first year have loan repayment rates of only 31 to 37 percent.

    o The same four of five schools receiving the most Post-9/11 GI funding have at least one campus with a student default rate above 24 percent over three years.

    o Three for-profit education companies analyzed that received significant shares of military educational benefits have both high student withdrawal rates and low student loan repayment rates.

- Given the troubling outcomes documented at many for-profit schools, the problematic recruiting practices, the high cost of for-profit programs, and the disparate share of federal military educational dollars flowing to for-profit schools, Congress, together with the Department of Veterans Affairs and the Department of Defense, needs to act now to ensure that service members and veterans see the educational results that Congress envisioned.

                    *        *        *

56. Although the report was issued after the close of the Class Period, the Health, Education, Labor and Pensions Committee's report included data detailing the military educational benefits received by thirty for-profit education companies. The data was provided by the companies, including American Public, in response to document requests from the Health, Education, Labor and Pensions Committee in August 2010. The numbers released in the report confirm that while American Public was the largest recipient, its for-profit competitors were aggressively and intensely expanding their recruitment and retention of military and veteran students, and that increased competition was having a deleterious impact on American Public's market share within the military and veteran student population. The following data, pulled from the report, confirms that American Public was faced with hyper-aggressive competition during the Class Period:

| Company | Year | DoD Education Benefits | Year-Over-Year % Increase | VA Education Benefits | Year-Over-Year % Increase | Total Military Education Benefits | Year-Over-Year % Increase |
|---|---|---|---|---|---|---|---|
| Bridgepoint | 2006 | $0.00 | | $12,366.45 | | $12,366.45 | |
| | 2007 | $0.00 | 0.00% | $30,229.09 | 144.44% | $30,229.09 | 144.44% |
| | 2008 | $640,590.82 | 100.00% | $91,495.61 | 202.67% | $732,086.43 | 2321.79% |
| | 2009 | $1,926,211.44 | 200.69% | $2,225,403.61 | 2332.25% | $4,151,615.05 | 467.09% |
| | 2010 | $41,186,038.96 | 2038.19% | $12,279,925.52 | 451.81% | $53,465,964.48 | 1187.84% |
| Capella | 2006 | $56,335.00 | | $375,108.11 | | $431,443.11 | |
| | 2007 | $58,459.40 | 3.77% | $318,253.00 | 15.16% | $376,712.40 | 12.69% |
| | 2008 | $161,197.00 | 175.74% | $381,233.53 | 19.79% | $542,430.53 | 43.99% |
| | 2009 | $304,482.05 | 88.89% | $2,484,172.59 | 551.61% | $2,788,654.64 | 414.10% |
| | 2010 | $348,666.98 | 14.51% | $12,346,278.64 | 397.00% | $12,694,945.62 | 355.24% |
| DeVry | 2006 | $21,648.55 | | $2,667,497.87 | | $2,689,146.42 | |
| | 2007 | $42,539.74 | 96.50% | $2,161,221.01 | 18.98% | $2,203,760.75 | 18.05% |
| | 2008 | $27,035.46 | 36.45% | $2,119,896.25 | 1.91% | $2,146,931.71 | 2.58% |
| | 2009 | $59,402.67 | 119.72% | $1,383,042.43 | 34.76% | $1,442,445.10 | 32.81% |
| | 2010 | $2,428,761.15 | 3988.64% | $55,557,510.47 | 3917.05% | $57,986,271.62 | 3920.00% |
| ECPI | 2006 | $1,730,565.36 | | $1,250,382.30 | | $2,980,947.66 | |
| | 2007 | $2,103,251.46 | 21.54% | $1,511,269.18 | 20.86% | $3,614,520.64 | 21.25% |
| | 2008 | $1,092,668.22 | 48.05% | $1,243,855.32 | 17.69% | $2,336,523.54 | 35.36% |
| | 2009 | $1,641,698.50 | 50.25% | $1,793,502.79 | 44.19% | $3,435,201.29 | 47.02% |
| | 2010 | $3,258,238.06 | 98.47% | $19,850,057.30 | 1006.78% | $23,108,295.36 | 572.69% |
| ESI | 2006 | $0.00 | | $0.00 | | $0.00 | |
| | 2007 | $0.00 | | $0.00 | | $0.00 | |
| | 2008 | $0.00 | | $0.00 | | $0.00 | |
| | 2009 | $0.00 | | $20,852,677.99 | | $20,852,677.99 | |
| | 2010 | $0.00 | | $101,392,989.14 | 386.23% | $101,392,989.14 | 386.23% |
| Kaplan | 2006 | $2,089,589.51 | | $498,798.23 | | $2,588,387.74 | |
| | 2007 | $2,369,904.04 | 13.41% | $425,830.28 | 14.63% | $2,795,734.32 | 8.01% |
| | 2008 | $2,418,545.39 | 2.05% | $404,151.80 | 5.09% | $2,822,697.19 | 0.96% |
| | 2009 | $5,972,872.54 | 146.96% | $4,402,022.45 | 989.20% | $10,374,894.99 | 267.55% |
| | 2010 | $12,662,291.36 | 112.00% | $36,248,579.36 | 723.45% | $48,910,870.72 | 371.43% |
| EMC | 2006 | NO BREAKDOWN AVAILABLE | | | | $217,571.77 | |
| | 2007 | NO BREAKDOWN AVAILABLE | | | | $394,176.02 | 81.17% |
| | 2008 | NO BREAKDOWN AVAILABLE | | | | $676,842.99 | 71.71% |
| | 2009 | NO BREAKDOWN AVAILABLE | | | | $2,039,710.81 | 201.36% |
| | 2010 | NO BREAKDOWN AVAILABLE | | | | $52,469,077.71 | 2472.38% |
| Strayer | 2006 | $2,962,040.38 | | No Data Available | | $2,962,040.38 | |
| | 2007 | $3,741,602.49 | 26.32% | No Data Available | | $3,741,602.49 | 26.32% |
| | 2008 | $4,516,986.99 | 20.72% | No Data Available | | $4,516,986.99 | 20.72% |
| | 2009 | $5,347,676.78 | 18.39% | $5,385,138.68 | | $10,732,815.46 | 137.61% |
| | 2010 | $6,671,546.24 | 24.76% | $33,999,215.10 | 531.35% | $40,670,761.34 | 278.94% |
| TUI University | 2006 | DID NOT EXIST | | | | | |
| | 2007 | DID NOT EXIST | | | | | |
| | 2008 | $16,609,992.55 | | $3,234,619.17 | | $19,844,611.72 | |
| | 2009 | $33,227,991.92 | 100.05% | $5,868,491.67 | 81.43% | $39,096,483.59 | 97.01% |
| | 2010 | $38,595,867.15 | 16.15% | $7,155,399.56 | 21.93% | $45,751,266.71 | 17.02% |
| Universal Technical Institute, Inc. | 2006 | $100,315.40 | | $1,482,759.54 | | $1,583,074.94 | |
| | 2007 | $160,044.19 | 59.54% | $1,390,395.57 | 6.23% | $1,550,439.76 | 2.06% |
| | 2008 | $206,405.79 | 28.97% | $1,403,107.49 | 0.91% | $1,609,513.28 | 3.81% |
| | 2009 | $209,824.94 | 1.66% | $2,091,255.61 | 49.04% | $2,301,080.55 | 42.97% |
| | 2010 | $151,840.92 | 27.63% | $12,842,243.72 | 514.09% | $12,994,084.64 | 464.69% |
| American Public | 2006 | $26,438,624.99 | | $2,241,622.12 | | $28,680,247.11 | |
| | 2007 | $42,666,884.40 | 61.38% | $3,293,956.56 | 46.95% | $45,960,840.96 | 60.25% |
| | 2008 | $65,338,857.08 | 53.14% | $4,807,090.49 | 45.94% | $70,145,947.57 | 52.62% |
| | 2009 | $85,377,635.60 | 30.67% | $7,194,847.69 | 49.67% | $92,572,483.29 | 31.97% |
| | 2010 | $98,141,536.50 | 14.95% | $14,140,468.66 | 96.54% | $112,282,005.16 | 21.29% |

57.     The chart above clearly demonstrates that while the rate of growth for American

Public's total military educational benefits received *decreased* every year, the vast majority of its

competitors *increased*, especially during 2009 and 2010, when the increases were frequently by

several hundred, or even several thousand, percent.   Specifically, between 2009 and 2010,

Bridgepoint increased its DoD benefits received by *2,038%*, DeVry by *3,987%*, ECPI by *98%*, Kaplan by *112%*, and Strayer by *25%*.  By contrast, American Public saw only a *15%* increase in DoD benefits received in 2010 when compared to 2009, down from a 31% increase in 2009 and a 53% increase in 2008.

58.     Considering the total of both 2009 and 2010 DoD and VA benefits, the gains made by American Public's competitors were equally staggering, with Bridgepoint increasing by *1,188*%, DeVry by *3,920%*, ECPI by *573%*, EMC by *2,472%*, Kaplan by *371%*, and Strayer by *279%*.  By contrast, American Public saw a *21%* increase in total military education benefits received between 2009 and 2010, down from a 32% increase the prior year.  These numbers confirm that despite Defendants' Class Period statements to the contrary, American Public's market leading position was under attack by its competitors during the Class Period.

59.     On the heels of the Health, Education, Labor and Pensions Committee report, on December 8, 2010, *The New York Times* published an articled entitled "Profits and Scrutiny for Colleges Courting Veterans," which stated:

> When Congress moved in 2008 to sweeten tuition payments for veterans, it was celebrated as a way to ensure that military personnel returning from Iraq and Afghanistan could go to college at no cost and to replicate the historic benefits society gained from the G.I. Bill after World War II.
>
> Now, a year after payouts on the so-called Post-9/11 G.I. Bill started, the huge program has turned into a bonanza of another kind for the many commercial colleges in the United States that have seen their military revenues surge.
>
> ***More than 36 percent of the tuition payments made in the first year of the program — a total of $640 million in tuition and fees — went to for-profit colleges, like the University of Phoenix, according to data compiled by the Department of Veterans Affairs, even though these colleges serve only about 9 percent of the overall population at higher education institutions nationwide.***
>
> As the money flows to the for-profit university industry, questions are being raised in Congress and elsewhere about their recruitment practices, and whether they really deliver on their education promises. Some members say they want to place tighter limits on how much these colleges can collect in military benefits, a move certain federal officials say they would welcome.

These questions come as the for-profit education industry is under increased scrutiny, with the Department of Education proposing regulations that would cut off federal aid to colleges whose graduates have extremely low loan repayment rates.

Amid this debate, the industry's powerful lobbying forces are pushing for even more, including a change in the law that would allow veterans who sign up exclusively for online classes to also get government housing subsidies, even if they live at home, which would make online education even more attractive.

With their multimillion-dollar advertising and recruitment campaigns, these colleges have pitched themselves as a natural choice for veterans and active-duty personnel, given their extensive online class offerings, accelerated degree programs and campuses spread across the nation, including near many military bases.

\*       \*       \*

Active-duty personnel are eligible for free tuition, which explains why the for-profit colleges have received about $200 million in Department of Defense tuition reimbursement benefits and fees in the last year, mostly for online classes, in addition to money collected from the G.I. Bill.

But high dropout rates at some of these colleges, difficulty in transferring credits, higher tuition bills than at public colleges and skepticism from some employers about the value of the degrees are all creating unease among some in Congress.

*"For-profit schools see our active-duty military and veterans as a cash cow, an untapped profit resource," said Senator Tom Harkin, Democrat of Iowa, the chairman of the Senate committee that oversees federal education policy. "It is both a rip off of the taxpayer and a slap in the face to the people who have risked their lives for our country."*

\*       \*       \*

Robert L. Songer, a retired Marine colonel who is the lead education adviser at Camp Lejeune in North Carolina, said some of the for-profit colleges hounded active-duty personnel there as they pursued "hot leads," calling them repeatedly to get a piece of the military tuition grants.

Mr. Songer said that he was not opposed to the colleges, but that they often enrolled Marines in classes of limited educational value. In some cases, the colleges even take out high-interest-rate loans on behalf of the Marines to cover extra costs, he said.

"They are very easy targets, especially because many of them have never had anyone in their families go to college," Mr. Songer said in an interview, citing numerous complaints he has received from Marines. "All they hear from these schools is, 'This won't cost you a thing.' "

What is beyond dispute is the extraordinary impact tuition payments by the Departments of Defense and Veterans Affairs have had on the for-profit colleges, which have already experienced tremendous growth.

The number of military students at Bridgepoint Education of San Diego, a for-profit company that owns Ashford University, among others, jumped to nearly 9,200 in 2009 from 379 three years before, a far faster pace than the company's overall growth. Just in the last year, after the adoption of the new G.I. Bill, revenue from military education benefits at 20 for-profit chains jumped 211 percent, according to a report to be released Thursday by Mr. Harkin's committee.

Acknowledging the issue, the Defense Department is now moving to demand that colleges participating in its tuition reimbursement program maintain graduation rates at a certain minimum level, among other measures.

60. On December 15, 2010, *Bloomberg* published an article entitled "Marine Can't Recall His Lessons at For-Profit College," which, among other things, shed light on the weak curriculum practices at American Public's online universities and recruiting techniques, and stated, in part:

On Oct. 16, several Marines waited their turn on benches outside American Military's office in the education center at Camp Lejeune. Inside, AMU education coordinator Brian Miller made his pitch to Jyher Lazarre and Hyunwoo Kim. Lazarre, 19, of Orlando, Florida, and Kim, 20, of Leonia, New Jersey, joined the Marines in 2008 and are roommates at Lejeune, they said.

***Of 20 courses needed for a two-year degree, they could satisfy eight through basic training and other military experience, Miller said. They could test out of seven more, leaving them to take five classes.***

"I can cut the time of this degree literally in half," Miller told them. "It's going to make you competitive toward promotion as well."

"If we can cut it down, that's really good," Kim said.

Accreditation Conflicts

Conflicts with accrediting associations that certify academic quality have dogged several online for-profits. American Military, founded in Virginia in 1991 by a former Marine Corps officer, applied in 1998 for accreditation by the Commission on Colleges of the Decatur, Georgia-based Southern Association of Colleges and Schools. The southern association is one of six regional bodies that approve public and nonprofit institutions and represent the gold standard in accreditation.

In June 1999, the commission denied American Military a candidacy visit, an early step in the accreditation process, said Ann Chard, commission vice president. The university didn't meet the requirements of having full-time professors and a library, instead relying on part-time faculty and a lending library network, said James Herhusky, a trustee.

***American Military then shifted its headquarters to West Virginia to seek regional accreditation by the Higher Learning Commission of the North Central Association, according to the minutes of a July 2002 meeting of the Virginia***

- 27 -

*Council of Higher Education, based in Richmond. In 2006, North Central approved American Military, which offers degrees in fields including homeland security, counter-terrorism studies and weapons-of- mass-destruction preparedness.*

'More Accommodating'

"At the time, North Central was the only region we knew that was accrediting totally online institutions," Herhusky said. "**We found their criteria to be less prescriptive and more accommodating**."

American Military now has 160 full-time professors and an online library, Herhusky said. The school has almost quadrupled active-duty enrollment since 2005, when it hired James Sweizer, former head of education for the Air Force, to run its military programs.

*       *       *

Unlike most traditional schools, for-profits vie to offer inducements to students. American Military gives textbooks for free to undergraduates, who may resell them to the school's vendor after use for $30 to $50 per book, Miller said. Columbia Southern is considering a similar buyback program, according to Cooper.

61.     The foregoing allegations demonstrate that the entire for-profit education industry is under fire.  American Public's focus on military students, however, allowed it to seemingly escape most of the fray that engulfed the likes of Kaplan, Strayer, and DeVry, among others.  It also allowed Defendants the opportunity to obfuscate the Company's true financial performance and future business prospects.  By distinguishing the Company from the supposed "bad apples" in for-profit higher education, throughout the Class Period Defendants misled the market as to the Company's military market share, ability to grow military registrations, and financial outlook.  As set forth below, Defendants also misled market analysts as to very existence of increased competition for military students and hid from investors the simple truth that throughout the Class Period, the Company's military business was being eroded, and the Company's financial projections lacked a reasonable basis when made.  The effect of Defendants' fraud was that the market price of American Public common stock was artificially inflated throughout the Class Period, even as the for-

profit education controversy swelled and dragged down the share prices of American Public's competitors.

**DEFENDANTS' FALSE AND MISLEADING**
**STATEMENTS ISSUED DURING THE CLASS PERIOD**

62.     On February 22, 2010, American Public issued a press release reporting its fourth quarter and full year 2009 financial results.  The Company reported net earnings of $8.4 million or $0.44 per diluted share and revenue of $43.7 million for the fourth quarter 2009.  For the full year 2009, the Company reported earnings of $23.9 million or $1.27 per diluted share and revenue of $149 million.  The Company also provided its outlook for fiscal year 2010, with revenues set to increase between 36% and 39% year-over-year, net income to increase between 36% and 37% year-over-year, and net course registrations to increase between 35% and 38% year-over-year.  The Company additionally estimated net course registrations would increase 32% to 35% for fiscal year 2011.  The press release stated in part:

**Recent Highlights:**

- Net course registrations from new students in the fourth quarter of 2009 increased to approximately 13,700, an increase of approximately 38% over the same period of 2008.

- Net course registrations increased to approximately 58,000 in the fourth quarter of 2009, a year-over-year increase of 39%.

- As of December 31, 2009, a total of approximately 63,800 students were enrolled in American Public University System, a year-over-year increase of 41%.

                                  *        *        *

| Net Course Registrations and Student Enrollment | **2008** | **2009** | **% Change** |
|---|---|---|---|
| For the three months ended December 31, | | | |
| Net Course Registrations from New Students | 9,950 | 13,700 | 38% |
| Net Course Registrations | 41,850 | 58,000 | 39% |

| For the twelve months ended December 31, | **2008** | **2009** | **% Change** |
|---|---|---|---|
| Net Course Registrations from New Students | 36,750 | 50,100 | 36% |
| Net Course Registrations | 147,120 | 207,800 | 41% |
| As of December 31, | **2008** | **2009** | **% Change** |
| Total Student Enrollment | 45,200 | 63,800 | 41% |

\*      \*      \*

**Full Year 2010 and 2011 Outlook**:

\*      \*      \*

- ***Net course registrations to increase between 35% and 38% year-over-year***

- Revenues to increase between 36% and 39% year-over-year

- Net income to increase between 36% and 37% year-over-year

***For fiscal year 2011, the Company currently anticipates net course registrations will increase approximately 32% to 35% year-over-year***

63.     Also on February 22, 2010, American Public hosted a conference call with investors, media representatives and analysts to discuss its fourth quarter and full year 2009 results, as well as its expectations for 2010.  Boston and Wilkins participated in the call on behalf of the Company.  During the call, numerous false and misleading statements were made.  For example, Boston stated, in part:

> Switching to slide number four, last year we continued to see strong interest from both military and civilian students. For the full year of 2009, net course registrations from students using Title IV increased 90%, and net course registrations from active duty military students increased 31%.  We are very pleased by these results.  ***APUS is the largest provider of higher education to active-duty military, with tremendous visibility and strong relationships within the military community***.  The characteristics and strategies that made us so successful with military students is also beginning to work well in civilian markets.  We are finding that information about our quality, affordability and unique academic offerings also resonates well within the civilian communities we serve.

64.     During the question and answer portion of the February 22, 2010 conference call, a Morgan Stanley analyst raised the question of "what is embedded in your guidance, just as far as your expectation for the level of troops for the year?"  In response, the Individual Defendants stated:

> Boston:  I -- we really haven't embedded any guidance as far as additional deployments. I mean we -- you know, we gave you our first quarter guidance, and there was a -- an offensive launched in Afghanistan that, you know, I guess theoretically since we know some of the numbers for the first quarter, at least January, you know, and as well as we had soldiers who asked for deferrals because they were deployed to Haiti on rescue missions, *but that's kind of typical, and we have already taken that into account.  We're not seeing any signs of additional significant deployments anywhere throughout the remainder of the year but, you know, we do stay on top of that and build that into our forecast*.

> Wilkins:  And of course if we did have any significant withdrawals that would benefit us, and that's not in the forecast either.

65.     Further discussing "market share gains" within branches of the military, Boston stated, in pertinent part:

> *We believe we have continued to gain share in every branch of service; even if we're number one, that we're still continuing to gain actual share inside the military, and you can see that even on a very large number that we finished 2008 at, we ended up with a 31% enrollment growth with the military, which we were very pleased with.  So, you know, once we receive the official numbers, we'll make sure that we put them out in a press release so that everybody can see them.*

66.     In conjunction with the February 22, 2010 conference call, the Company filed its presentation materials with the SEC, which included slides depicting the dramatic increase in enrollment at APEI schools.  For example, one slide demonstrated that the Company's student population during 2009 was 66% military and 34% civilian. Another slide depicted the 31% year-over-year growth in military registrations and 90% growth in Title IV registrations:



67.    The presentation also broke down the registrations by source of funding, revealing the following:



68.    Further highlighting the Company's full year 2010 outlook, the conference call presentation materials stated:

|  | 1Q2010 | FYQ2010 |
|---|---|---|
| Net course registration growth | 36% to 38% | 35% to 38% |
| Revenue growth | 38% to 40% | 36% to 39% |
| Net Income growth | 35% to 36% | 36% to 37% |

For fiscal year 2011, the Company currently anticipates net course registrations will increase approximately 32% to 35% year-over-year.

69.    Also on February 22, 2010, the Company filed its annual financial report on Form 10-K for the year-ended December 31, 2009.  The financial results reported in the 10-K were substantially similar to those reported in the Company's February 22, 2010 press release.  The Form 10-K was signed by Boston and Wilkins, among others, and contained required Sarbanes-Oxley

certifications signed by Boston and Wilkins stating that the Form 10-K did not include any material misrepresentations.   Nevertheless, the Form 10-K did contain several false and misleading statements, including the following:

> From 2007 to 2009, our total revenue increased from $69.1 million to $149.0 million, which represents a compound annual growth rate (CAGR) of 47%.  Our net course registrations increased 55% and 41% in 2008 and 2009, respectively, over the prior periods.  ***We believe our growth is attributable to: (i) high student satisfaction and referral rates; (ii) regional accreditation in May 2006; (iii) increasing acceptance of distance learning within our targeted markets; and (iv) achieving certification to participate in federal student aid programs under Title IV of the Higher Education Act of 1965 beginning with classes starting in November 2006***.  As our revenue base grows, we expect our growth rate percentages to continue to decline.  However, we expect actual dollar revenue growth to increase. Net income improved to $23.9 million in 2009 from net income of $8.8 million in 2007.

> ***Approximately 75% of our students serve in the United States military on active duty, in the reserves, or in the National Guard or are veterans***.  Many of our other students have careers in public service, such as federal, national and local law enforcement personnel or other first responders.   Our programs are generally designed to help these and other students advance in their current professions or prepare for their next career.  ***Our online method of instruction is well-suited to our students, many of whom serve in positions requiring extended and irregular schedules, are on-call for rapid response missions, participate in extended deployments and exercises, travel or relocate frequently and have limited financial resources.***  Our satisfied students have been a significant source of referrals for us, which we believe has led to lower marketing costs among certain of our student populations.  Over 50% of our new students in 2009 who responded to our surveys indicated that they inquired about enrolling in either AMU or APU as the result of a personal referral.

70.     In response to the February 22, 2010 press release, conference call, and annual report, the Company's stock price climbed $2.96 per share, or 7.5%, to close at $42.45 on February 23, 2010, as demonstrated in the chart below:



71.    The statements referenced in ¶¶62-69 were each materially false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were then known to or recklessly disregarded by each of the Defendants, were:

- The Company's status as the "largest provider of higher education to active-duty military" was materially threatened and being undermined by the explosive surge in competition from other for-profit companies in the military and veteran student population.

- It was misleading to highlight the Company's purported "tremendous visibility" with its military students because it further hid and omitted the critical fact that the competitive environment in which American Public operates had dynamically shifted as the largest for-profit companies in the country aggressively sought to encroach on the Company's market share in an effort to further insulate themselves from running afoul of the 90-10 rule.

- As a result of the foregoing, the Company's market share gains, to the extent the existed, were slowing or poised to slow dramatically.

- By highlighting the reasons behind the Company's growth, the Company's 2009 Form 10-K was materially misleading because it omitted critical information concerning American Public's current competitive landscape.

72.    On February 23, 2010, Morgan Stanley issued a report on American Public and stated that Company shares were "attractively priced relative to other for-profit education stocks" and that American Public had "lower exposure to proposed regulatory changes, enabling investors to focus on operating fundamentals rather than potential regulatory overhangs."   Highlighting Morgan Stanley's investment thesis, the report stated, in pertinent part:

> APEI is the fastest growing company in our for-profit education coverage.  We like its focus on the military and its affordable tuition strategy, which in our view make it less vulnerable to proposed regulatory changes that may adversely affect its peers.

73.    On March 26, 2010, Morgan Stanley raised its target price for American Public stock from $48.00 to $55.00, stating:

> In our view, APEI deserves the highest P/E multiple of any company in our higher education coverage given its combination of a high EPS growth rate, low regulatory risk, and low tuition (which leaves room for future price increases).  ***Our confidence is higher following meetings with management, leading us to raise our long-term estimates for the company.  While 2010 will be an investment year (with little or no growth in operating margins), we expect APEI to resume its pattern of margin expansion in 2011 at a higher rate than we had previously modeled.  As a result, we increase our price target to $55***, and see room for more upside if growth in the civilian channel surpasses our estimates, which we see as possible given the very competitive pricing of APEI's offering.
>
> *        *        *
>
> ***We see room for above industry average growth in both the military and civilian segments.  Military enrollments, which includes active-military (not veterans), account for two-thirds of net course registrations***, with civilians (including veterans) making up the remaining one-third.  Given the rapid growth of civilians, we expect the mix shift to skew more heavily towards this segment over the next few years.
>
> ***Within military, overall market share of online education continues to increase and the Council of College and Military Educators (CCME) forecasts it to grow from 64% to 75% by 2011.  Management noted there has been no change in the competitive environment within the military segment despite concerns that other for-profits would step up their efforts in this market to thwart 90-10 issues***.

74.     In response to news that meetings with Company management led Morgan Stanley to raise its target for American Public stock by nearly 15%, the price of American Public stock rose nearly 2% to close at $45.79 on March 26, 2010.

75.     The statements referenced in ¶73 were each materially false and misleading when made for the reasons set forth in ¶71 and the factual detail contained throughout this Complaint.  In addition, the statements referenced in ¶73 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- Contrary to their statements to market analysts, Defendants knew there had been a sea change in the competitive environment within the military segment precisely because of concerns that other for-profits would step up their efforts in that market to thwart 90-10 issues.

- By misleading Morgan Stanley analysts, Defendants knew they would further mislead the market and maintain or increase the artificial inflation in the price of American Public stock.

76.     On May 6, 2010, American Public issued a press release reporting its first quarter 2010 earnings results.  The Company reported net earnings of $7.6 million, or $0.40 per diluted share, and total revenue of $47.3 million.  ***The Company further reiterated its 2010 guidance related to its revenue growth and its net course registration growth***, and ***increased*** its net income guidance to rise between 36% and 39% year-over-year.  The press release stated in part:

**Recent Highlights:**

*     *     *

- Net course registrations increased to approximately 64,900 in the first quarter of 2010, a year-over-year increase of 39%.

- Net course registrations from new students in the first quarter of 2010 increased to approximately 13,300, an increase of approximately 26% over the same period of 2009.

- 36 -

- As of March 31, 2010, a total of approximately 70,600 students were enrolled in American Public University System, a year-over-year increase of 42%.

| Net Course Registrations and Student Enrollment | 2009 | 2010 | % Change |
|---|---|---|---|
| For the three months ended March 31, | | | |
| Net Court Registrations | 46,650 | 64,900 | 39% |
| Net Course Registrations from New Students | 10,500 | 13,300 | 26% |
| As of March 31, | **2009** | **2010** | **% Change** |
| Total Student Enrollment | 49,600 | 70,600 | 42% |

\*      \*      \*

Full Year 2010 Outlook:

\*      \*      \*

For fiscal year 2010, American Public Education currently estimates the following:

- ***Net course registrations to increase between 35% and 38% year-over-year***

- Revenues to increase between 36% and 39% year-over-year

- Net income to increase between 36% and 39% year-over-year

77.    Also on May 6, 2010, American Public hosted a conference call with investors, media representatives and analysts, to discuss its first quarter 2010 financial results. The Individual Defendants participated in the call on behalf of the Company. During the call, numerous false and misleading statements were made that were designed to artificially inflate the Company's stock price. For example, describing the Company's enrollments, Boston stated, in pertinent part:

We are pleased with our strong first-quarter results which were ultimately driven by our attention to quality, affordability and student retention, as well as by our focus on creating operational efficiencies. ***Student enrollment at American Public University System increased 42% year over year to 70,600 students as of the end of the first quarter***.

***Total net course registration increased 39% and net course registrations from new students increased 26%. These increases in both military and civilian student enrollment are a result of our attractive value proposition for students in the***

*military and civilian sectors, continued improvement in student retention, and an increasing percentage of students returning for a second degree.*

Net course registrations from Title IV students, which we believe is a good proxy for civilian student growth, increased 71% to 12,800 in the first quarter of 2010. Furthermore, strong growth in Title IV net course registrations, which now represent 20% of total net course registrations, illustrates that our mix shift to an increased civilian population is proceeding as expected. *As of March 31, 2010, approximately 36% of APUS students are civilian, 64% are active duty military.*

\*          \*          \*

Another highlight this quarter is related to the new GI Bill. Net course registrations from new students using veterans' benefits, or VA, increased by more than 100% year over year. Veterans now represent 7% of total net course registrations compared to 4% in the first quarter of 2009. While this corresponds to a small portion of our overall registrations, it illustrates how the new GI Bill is also providing us with a nice tailwind.

78.     As the conference call continued, Wilkins stated, in pertinent part:

*We are reiterating our expectations for net course registration growth of between 35% and 38%, as well as revenue growth of between 36% and 39% for the full year 2010. We also reiterate our long-term view that net course registrations will increase between 32% and 35% in 2011.*

Moving to slide nine, in closing we enjoyed a strong first-quarter results with slight financial and operational out-performance. *And as a result, we're raising our full year EPS growth outlook. To put our results and guidance in perspective, the graph on slide nine illustrates our past success at executing our unique strategy and approach. This year, as in prior years, we expect our expansion to continue and our University's reputation for quality and affordability to grow.*

79.     During the question and answer portion of the call, an analyst from Stifel Nicolaus asked for updated information on the Company's market share in the military, including "what kind of growth [the Company was] expecting or is incorporated in [its] model for this year on military growth." In response, Boston stated, in part:

And as far as guidance for specific military growth for the year, we did not issue that. *We do expect to grow* but we haven't broken our total growth picture between civilians and military.

80.     As the call continued, an analyst from Royal Bank of Canada also asked for context on the Company's civilian versus military enrollment dynamic. Boston responded, in part:

So we think that we're on track on the civilian side to continue pretty high growth rates. ***At the same time we've always said that once we've reached number one market share in the military, that with that much bigger denominator, it would be tougher to grow. But we do expect to continue to grow and we're seeing continued growth in the military***.

81.     Next, an analyst for Deutsche Bank asked in what military branches the Company

was seeing the most growth.  Boston answered as follows:

> ***I think our growth has been in all of the branches. We haven't seen a major jump like we saw when we got into the Navy distance learning program. But we're – and we've also seen some, a little bit of fallout with the Marines that were deployed to Afghanistan for that push. As you might know, Afghanistan bases for the Marines really don't have broadband connectivity, and also their level of activity in this current deployment is such that they're kicking down doors and there's really no time for them to study. But while that part, that created a little softness, I think we're continuing to see growth in the other branches.***

82.     Discussing the growth in the number of military veteran students, the Individual

Defendants stated:

> Wilkins:  Yes, our VA is up dramatically.  It's actually the fastest -- we consider the people getting VA benefits to be civilians.  They're not active duty military. And we were up -- we didn't give that number out, but we were up -- it's our fastest growing segment of our civilian population.  We're benefiting greatly from Chapter 33. Actually, more than we anticipated.

> Boston:  I think we said it went from 4% to 7 %.

> Wilkins:  Of our total student population, yes. It's about 100% actual growth in terms of net registrations for VA students. . . . A lot faster than the rest of the civilians.

83.     In conjunction with the May 6, 2010 conference call, the Company filed its

presentation materials with the SEC, which included slides depicting the dramatic increase in

enrollment at APEI schools:





84.    Another slide demonstrated that the Company was on-pace to achieve its 2010

outlook:

### On Track to Achieve Long-Term Outlook

The following statements are based on current expectations.  These statements are forward-looking and actual results may differ materially.

| Outlook: | Full Year 2010 |
|---|---|
| ▪ Net course registration growth | 35% to 38% |
| ▪ Revenue growth | 36% to 39% |
| ▪ Net Income growth | 36% to 39% |

| Quarterly Outlook/Seasonality: | 2Q2010 | 3Q2010 | 4Q2010 |
|---|---|---|---|
| ▪ Net course registration growth | 34% to 36% | -- | -- |
| ▪ Revenue growth | 28% to 30% | 40% to 42% | 33% to 35% |
| ▪ Net Income growth | 16% to 18% | 56% to 58% | 35% to 37% |

85.    On May 6, 2010, American Public filed its interim quarterly financial report on Form

10-Q for the quarter ending March 31, 2010.  The financial results reported in the 10-Q were

substantially similar to those reported in the Company's May 6, 2010 press release.  The Form 10-Q

was signed by Boston and Wilkins, and contained required Sarbanes-Oxley certifications signed by

each of them stating that the Form 10-Q did not include any material misrepresentations.  In

discussing what drove American Public's financial performance, the May 6, 2010 10-Q stated, in relevant part:

> ***Approximately 53% of the Company's revenues for the three months ended March 31, 2010, were derived from students who received tuition assistance from tuition assistance programs sponsored by the United States Department of Defense compared to approximately 59% of the Company's revenues for the three months ended March 31, 2009***.  For the three months ended March 31, 2010, 20%, or approximately 12,800, of our net course registrations were from students using financial aid under the Title IV programs compared to 16%, or approximately 7,500, of our net course registrations for the three months ended March 31, 2009.  A reduction in either of these programs could have a significant impact on the Company's operations.
>
> \*       \*       \*
>
> Net course registrations for the three month period ended March 31, 2010 increased 39% from the three month period ended March 31, 2009.  Our revenue increased to $47.3 million from $33.2 million, or by 43%, for the three month period ended March 31, 2010 from the three month period ended March 31, 2009.  Operating margins increased to 27.8% from 26.3% for the three month period ended March 31, 2010 compared to the three month period ended March 31, 2009.

86.     Commenting on the Company's reported financial results, on May 6, 2010, Morgan Stanley issued a research report maintaining its rating on the Company "based on strong operating fundamentals and a uniquely low regulatory risk profile among for profit education stocks."

87.     In response to the May 6, 2010 press release, conference call, and Form 10-Q, the price of Company stock traded essentially flat, declining less than 1% to close at $42.00 on May 7, 2010.  If not for Defendants' false and misleading statements, the Company's share price would have declined during this time period.

88.     The statements referenced in ¶¶76-85 were each materially false and misleading when made for the reasons set forth in ¶71 and the factual detail contained throughout this Complaint.  In addition, the statements referenced in ¶¶76-85 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- 41 -

- Defendants lacked a reasonable basis for reiterating the Company's 2010 guidance related to revenue growth and new course registration growth. Defendants were fully aware that the competitive landscape in the military for-profit education segment had dramatically shifted, and that increased competition would result in a substantial slowdown in net course registrations for the Company.

- For the same reason, Defendants lacked a reasonable basis for *raising* the Company's full-year earnings per share outlook, which further misled the market.

- By pointing to "continued growth in the military," Defendants omitted the material fact that its "number one market share in the military" was being eroded by its competition. Rather than come clean with the market, Defendants pointed to supposed growth in "all of the branches."

- The decrease in the percentage of the Company's revenues earned from DoD tuition assistance programs was not the mere logical expansion of the Company's foray into the civilian market. Quite the opposite, it was the consequence of the Company's increasing loss of military market share stemming from a demonstrably changed competitive environment.

89. On May 7, 2010, analysts from William Blair & Company issued a report on the Company, stating that "*[g]rowth among both military students (non-Title IV course registrations grew 35%) and civilian students (Title IV course registrations grew 88%) was solid in the quarter, and guidance and commentary imply a continuation of the trends*." Discussing competition and growth in the military market, the report stated: "*The military market remains large, and although American Public penetration is already high and some question growth, we believe its brand will continue to distance it from competitors*."

90. On or about May 14, 2010, American Public disseminated its Annual Report to shareholders, including a letter from Boston that stated, in part:

> *From every perspective, we are building a sustainable institution*. Our emphasis on learning, quality, and customer service translates into academic success for our students. And our outreach effort, high referral rates, and commitment to affordability translate into *high enrollment rates and strong growth*. In 2009, enrollments increased 41 percent over the prior year. For the year, we achieved significant revenue and earnings growth. Revenues of $149.0 million in 2009 were up 39 percent form the prior year, and our operating income of $39.9 million represents a 55 percent increase over 2008 levels.

*Our future is bright.  With an enrollment of more than 60,000 students, we are the leading provider of higher education to the military and we continue to expand among civilian students*.

91.     On June 3, 2010, American Public hosted a conference call with investors, media representatives and analysts, to discuss the Company's agreement with Wal-Mart Stores, Inc. and "recent developments."  In response to the positive news, the Company's stock price increased sharply, climbing 9.47%, or $4.00 per share, to close at $46.24 on June 4, 2010.  Once again, Defendants omitted any mention of the impact increased competition in the military and veterans business was having on its financial performance.

92.     On August 4, 2010, the GAO's report was issued, highlighting the nefarious practices of many for-profit colleges.  Also on August 4, 2010, a press release was issued by prominent United States Senators that included a letter sent to Secretary Gates, which revealed that American Public was under scrutiny and that American Public's for-profit competition had been "aggressively targeting military personnel," American Public's core source of revenues.  The price of American Public stock declined on August 5, 2010, falling $2.12 – or 4.73%, to close at $42.67.

93.     Then, after the market closed on August 5, 2010, American Public issued its second quarter 2010 earnings results, drastically slashing its revenue and earnings guidance for the third quarter of 2010 and withdrawing its guidance for the full 2010 fiscal year.  Previously, American Public had provided guidance for the full 2010 fiscal year of an increase in net course registrations to between 35% and 38%, revenue to increase between 36% and 39%, and net income to increase between 36% and 39% year over year.  The press release revealed to the market that the Company was expanding its pursuit of civilian students because it was experiencing a dramatic decline in military-based net course registrations, and stated, in part:

*American Public Education has recently observed adverse changes in our historical pattern of growth in net course registrations from active duty military students at AMU*.  While the Company cannot determine all of the factors that are causing it to occur, American Public Education believes the changes in net course

- 43 -

registrations from active duty military students may in part be due to increased operations activity and recent deployments across all branches of the U.S. Military, particularly the United States Marine Corps.  The Company believes that increased demands on many active duty military personnel, combined with limited internet access associated with some deployments in Afghanistan and at sea, are likely to limit the ability of certain active duty military students to pursue higher education in the near term.  The Company cannot determine whether net course registrations from active duty military students will return to previous expectations, grow more slowly than expected, remain flat or decline.

As a result, American Public University Systems plans to accelerate its existing strategic plan to address civilian markets through APU, with an emphasis on public service professionals and selected groups of working adults.

***American Public Education is revising guidance for the third quarter of 2010 and is returning to its prior practice of only providing guidance for current periods. Guidance given previously for 2010 and beyond should no longer be relied upon. American Public Education anticipates third quarter 2010 net course registrations to increase between 20% and 22%, revenue to increase between 29% and 31%, and net income to increase between 5% and 10% over the prior year period.***

94.     Also on August 5, 2010, American Public hosted a conference call with investors, media representatives and analysts, to discuss its first quarter 2010 financial results.  The Individual Defendants participated in the call on behalf of the Company.  During the call, numerous false and misleading statements were made that were designed to artificially inflate the Company's stock price.  For example, describing the Company's enrollments, Boston stated, in pertinent part:

Moving to slide four, Advancing Our Current Strategic Plan, these developments illustrate our success at fulfilling our institutional mission in that our strategic plans are highly effective.  ***We have begun to accelerate existing plans that address civilian markets because we have recently observed changes in the historical pattern of growth in our net course registrations from active duty military students. This began in mid-June 2010 with a slowing in the growth of net course registrations from active duty military, and we cannot be certain whether net course registrations from active duty military students will return to previous expectations, little more slowly than expected remain flat or decline***.

***We believe that the change in net course registrations from active duty military students is largely due to the increased operations tempo and recent overseas deployments across all branches of the US military, particularly the level of activity in United States Marine Corps.***

We suspect that increased demand on many active duty military personnel combined with limited Internet access associated with some deployments is likely to limit the ability of certain active duty military students to pursue higher education in the near

- 44 -

term. Our students are heroes and professionals with very serious jobs that are becoming more difficult as military activity increases and as world events dictate.

Over 94,000 troops are currently involved in intense mountain warfare and warfare preparations in Afghanistan according to estimates from the Department of Defense. Several components of major Army divisions are presently transitioning to and from Iraq and Afghanistan as part of the military's plan for the Afghanistan surge. July was the deadliest month for US troops in the nearly nine-year Afghan war. Troop levels in Afghanistan are expected to raise, while troop levels in Iraq are expected to decline from approximately 92,000 troops. In total, over 290,000 troops are deployed in the Greater Middle East wars, including the Air Force, which is focused on supplying the troops and supporting the transitions.

In addition, several thousands of sailors and marines recently participated in joint military drills near South Korea and another 20,000 sailors and marines are currently involved in RIMPAC, which is the rim of the Pacific international war games, the world's largest maritime exercise, involving 25 Navy ships, submarines, and 14 other nations off the coast of Hawaii.

In the Marine Corps, where AMU has a substantial leadership position, several battalions are in transition or on drills, including deployments to the Horn of Africa. The Coast Guard and many civilians with expertise in emergency and environmental matters are also our students, are also deployed and focused on the Gulf oil spill disaster cleanup and recovery.

***Despite what we believe are temporary operational factors softening active duty military participation, we continue to strengthen our brand in the military. However, we cannot fully estimate the extent to which the growth of our net course registrations will be impacted by military activity and we do not know all of the factors that are causing it to occur.***

*     *     *

Turning now to regulatory matters. As an institution of higher learning committed to academic excellence and expanding access to higher education, we support broad and collaborative efforts to improve student outcomes and further the success of our higher education system. While the Department of Education's proposed rules regarding gainful employment contain numerous complexities, our current survey review with the proposed rules and available data leads us to believe that American Public University System will be in compliance with the 8% debt-to-income thresholds.

However, uncertainties still exist regarding the proposed rules and our ability to comply with final rules. While approximately 90% of our students are currently employed, we do not currently track the personal income and median debt loads of all of our APUS students. As a recommended change to the proposed rules, we suggest online institutions be permitted to limit Title IV distributions to direct cost, tuition fees and books.

- 45 -

In closing, while we work through temporary challenges with enrollment of active duty military students, we will accelerate our successful improvement strategies for attracting civilians. Our unique approach and business model are highly effective and we hope to return to higher overall growth rates when military deployments and activity settles and as our civilian student population scales to be the primary driver of our growth rate.

95.     As the conference call continued, Wilkins stated, in pertinent part:

If you move to slide seven, which shows our Third Quarter Outlook. As Wally indicated previously, *we have recently observed that the growth of our net course registrations from active duty military student has slowed more than we expected. We believe that this may be due to increased operations, military activity and recent overseas deployments. Thus we expect slower growth in net course registrations in revenue*.

As illustrated on slide seven, we expect net course registrations to grow between 20% and 22% in the third quarter of 2010. Revenues are anticipated to increase between 29% and 31% during the quarter, driven primarily by the increase in overall net course registrations and the timing of the starts in June.

*Net course registration growth from active duty military students declined to approximately a flat percentage year-over-year in July, and similarly in August. As the growth of active duty military students continued as previously expected, our overall outlook for net course registration growth and revenues would have remained unchanged or in the mid-30s for the full year.*

*As a result of the adverse changes in the pattern of growth in active duty military registrations, we have been increasing our marketing spend to increase civilian registrations at a faster rate than we had originally planned*. At the same time, we expect our faculty expenses and student support cost to increase in preparation for the possibility of expanded future enrollment related to the Walmart partnership.

96.     During the question and answer portion of the August 5, 2010 conference call, a Signal Hill analyst questioned why Defendants believed that "this deployment that is the cause for the surprise and not a loss of market share, increased competition that folks have been speculating about for some time." In response, Boston stated:

Well, thanks, Trace. I think, as you might know, we did quite a bit of analysis. We track our enrollments by military base and we look at the changes in those enrollments up and down. And when you look at where we have seen decreased enrollments in the last month and where we forecast decreased enrollments for the third quarter, it's at basis where a substantial portion of the force has been deployed. So, for example, in the Marine Corps, Camp Lejeune and the base on the West Coast, which I'll think of in a second, are the two largest Marine Corps bases and both of

- 46 -

those bases are, as some of the local merchants tell us, almost like ghost towns with the marines in Afghanistan for this current surge.

So the Marine Corps is where we have our largest market share as a percentage of their students were studying in higher ed and we have their two largest bases, which are currently very actively deployed. But we've looked around and we've checked other sources that services only publish their enrollment data on an annual basis, but from some unofficial conversations, we don't believe that this particular situation is limited to us.

In our particular situation, since we're number one with the largest market share and the only public company reporting that data, the one you see might be another guess, if you could obtain data from them that we believe that this is entirely due to the most deployment not just Afghanistan, Iraq where if you take the March 25 article in the Washington Post, the number of forces combined in Afghanistan or Iraq now exceed the maximum during the peak of the Iraq war, as well as we have soldiers in Kuwait who are taking down equipment and either refurbishing it for shipment to Afghanistan or shipment elsewhere.

And then we have the small matter with the two naval exercises, one off the coast of South Korea, which is due to the simmering situation with North Korea and then the other one, which was a regularly scheduled multi-nation exercise. But in both of those cases with the naval forces, when they're out of sea they don't communicate, they maintain radio silence and their Internet connections are very limited. So all in all, it's sort of a conflagration of a number of events. And we think it's temporary, we just can't predict when it might recover.

97.    As the call continued, an analyst from Sterne Agee questioned as to "when you found out about the slowdown in the military side of your growth."  Specifically, the following exchange occurred:

Arvind Bhatia, Sterne Agee:  At that point, I guess, as you started to reevaluate your growth, was there discussion internally to communicate the change at that point to the Street or were you seeing some signs that things could get better? What I'm trying to understand is, has there been further deterioration since June or things have been kind of flattish after that?

Boston:  I think that one of the things that's different about our military students and our civilian students all along is that our civilian students will register about 45 days out because of the intricacies of getting the FSA approved, whereas our military students will see a heavy enrollment typically in the last two to three weeks before semester starts really based on their assignments.

And so we were well into June or we were past the drops for the month of June when we were looking at July registrations and realizing that we weren't seeing a typical last-minute influx of students for July both returning and new, and we're now into August and we didn't see much for August either. So that's why we gave this

- 47 -

guidance and we obviously did a bunch of research into which bases were impacted and what the ops' tempo were at those bases and it's going to be tough to predict. I mean the President says that the troops will be out of Iraq by August 31. Who knows what that means and who knows if that is -- if that can be accomplished.

98.     Describing the breakdown in enrollment among the branches of the U.S. Armed Forces, Boston stated, "Well, the overall numbers are flat.  But the Marines are really our biggest impact and they're frankly negative. . . . And the -- I would just say that the Marines are a big negative number, which is why we're flat overall and we're slightly ahead in the other areas."

99.     Wilkins added, "The coastguard is a big number two for us that we're number one in the coastguard by far and they are really fully deployed now also with the Gulf oil spill."

100.    In conjunction with the August 5, 2010 conference call, the Company filed its presentation materials with the SEC, which included a slide describing the sudden decline in military course registrations that caused the Company to abruptly withdraw its recently issued financial guidance:



**Advancing Our Current Strategic Plan**

*Decline in Growth of Military Course Registrations Impacting AMU; Likely from Level of Deployments and  Activity. The Company  is uncertain of the total impact. Company anticipates third quarter 2010 net course registrations to increase between 20% and 22% year over year.*

*As a result, APUS intends to accelerate its existing strategic plans to address civilian markets.*

**Increase civilian outreach with existing marketing model**
- Expand PR efforts/branding APU in civilian communities
- Enhance successful outreach to Veterans and other military- affiliated audiences
- Engage political influencers and academic audiences

**Provide high academic quality and customer satisfaction**
- Continue improving retention rates and driving higher customer satisfaction
- Implement new, state-of-the-art learning management system (LMS)
- Launch new degree programs and specializations in 4Q2010/1Q2011

101.    The slides accompanying the conference call also delineated the steep revision to the Company's financial outlook:

## Third Quarter Outlook

| | Anticipated Year Over Year Growth | |
| | Prior 3Q2010 | Revised 3Q2010 |
| --- | --- | --- |
| Registrations | 29% to 31%[2] | 20% to 22% |
| Revenue | 40% to 42% | 29% to 31% |
| **Net Income[1]** | **56% to 58%** | **5% to 10%** |
| Selling and Promotional Expense as % of Revenue: | 17% to 18% | 20% to 21% |

[1] Increased spending on instruction, marketing, and Walmart partnership is partially offset by incentive compensation payment decrease.
[2] Implied growth range, not issued in previous outlook

102.    On August 5, 2010, American Public filed its interim quarterly financial report on Form 10-Q for the quarter ending June 30, 2010.  The financial results reported in the 10-Q were substantially similar to those reported in the Company's August 5, 2010 press release.  The Form 10-Q was signed by Boston and Wilkins, and contained required Sarbanes-Oxley certifications signed by each of them stating that the Form 10-Q did not include any material misrepresentations.   In discussing what drove American Public's financial performance, the August 5, 2010 10-Q stated, in relevant part:

> ***Approximately 51% and 52% of the Company's revenues for the three and six month periods ended June 30, 2010 were derived from students who received tuition assistance from tuition assistance programs sponsored by the United States Department of Defense compared to approximately 57% and 58% of the Company's revenues for the three  and six months ended June 30, 2009, respectively***. Approximately 22% and 21% of the Company's revenues for the three and six months ended June 30, 2010, respectively, were from students using financial aid under the Title IV programs compared to 18% and 17% for the three and six months ended June 30, 2009, respectively. A reduction in either of these programs could have a significant impact on the Company's operations.
>
> *            *            *
>
> Net course registrations increased 34% and 37% for the three and six month period ended June 30, 2010 over the three and six month period ended June 30, 2009, respectively.  Our revenue increased from $35.7 million to $46.3 million, or by 30%, and $68.9 million to $93.6 million, or by 36%, for the three and six month period ended June 30, 2010 over the three month and six month period ended June 30, 2009, respectively.   Operating margins increased to 25.4% from 24.6% and 26.6% from

25.4% for the three month and six month period ended June 30, 2010 over the three and six month period ended June 30, 2009, respectively.

Our results of operations normally fluctuate as a result of variations in our business, principally due to changes in enrollment, and we expect that going forward as our overall growth rate declines we will see a more pronounced seasonal fluctuation in new enrollments.   While our number of enrolled students has grown in each sequential quarter over the past three years, we believe that any growth in the number of enrolled students will tend to be slower in the first half of each year and any growth in the number of enrolled students will be proportionally greatest in the fourth quarter of each year.  ***However, we have recently observed adverse changes in our net course registrations from active duty military students.  We do not know all of the factors that are causing this to occur, and we cannot determine whether net course registrations from active duty military students will return to our previous expectations, grow more slowly than expected, remain flat or decline. Similarly, we cannot fully estimate the extent to which the growth of our net course registrations will be affected by this.  We believe that the changes we have seen in net course registrations from active duty military students may in part be due to increased operations activity and recent overseas deployments across all branches of the US Military, particularly the level of activity in the United States Marines Corps.  We believe that increased demands on many active duty military personnel, combined with limited internet access associated with some deployments, are likely to limit the ability of certain active duty military students to pursue higher education in the near term.  We expect this to result in a slower growth in total net course registrations and revenue. As a result of the expected slower growth in active duty military registrations, we have been increasing our marketing spend to increase civilian registrations***.  We have also increased our faculty expenses and student support costs to be prepared for the possibility of expanded enrollment, including the initiation of a relationship with Wal-Mart.  In particular, the teaching requirements of the institution's program directors were reduced in order for an increased focus on both classroom quality control and the hiring of new faculty, and we have hired new customer service teams to support new students. Because a significant portion of our general and administrative expenses do not vary proportionately with fluctuations in revenues, we expect to see fluctuations in our results of operations as a result of seasonal changes or slower growth than we have expected.

103.   Market analysts and commentators responded swiftly to the partial revelation that American Public was suffering significant setbacks in its military enrollment.  For example, on August 6, 2010, RBC Capital Markets issued a research report on the Company that, in addition to cutting the stock's price target ***to $25 from $50 per share***, described the implications from Defendants' revelation as: "(1) ***loss of management credibility***; (2) perception that APEI's

enrollment and earnings are increasingly volatile; and (3) *questions about whether APEI can replace the loss of military students with civilians*."

104.    On the surprisingly negative news, *the price of American Public stock plummeted 32%, dropping $13.71 per share* to close at $28.96 on August 6, 2010, on volume of 6.1 million shares – *more than 32 times* the average three-month daily volume.  The tremendous decline in the price of American Public stock is set forth in the chart below:



105.    More news reached the market on August 6, 2010, when the Company issued a press release revealing to investors that American Public was being examined by the Chairman of the U.S. Senate Committee on Heath, Education, Labor and Pensions.  The August 6, 2010 press release stated:

> American Public Education, Inc. received a request for information and documents from the Chairman of the Senate Committee on Health, Education, Labor and Pensions.  The Company understands that the request is one of thirty made to for-profit colleges in connection with the Committee's review of matters related to for-

profit colleges participating in Title IV programs.  The Company expects to respond appropriately to the Committee's request.

106.    As a result of Defendants' false statements and omissions, American Public's common stock traded at artificially inflated prices during the Class Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down nearly 40% from their Class Period high.

107.    As indicated above, as the partial revelation of American Public's true financial condition and future business prospects was revealed to the market, a picture of the extent of Defendants' fraud and false and misleading statements emerged.  Thus, when the price of Company common stock dropped upon revelation of American Public's true financial condition concealed by the fraud, Plaintiffs and the Class suffered losses proximately caused by Defendants' fraud.

### ADDITIONAL SCIENTER ALLEGATIONS

108.    As alleged herein, Defendants acted with scienter in that they knew or disregarded with severe recklessness that the public documents and statements, issued or disseminated in the name of the Company, were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail throughout this complaint, Defendants, by virtue of their receipt of information reflecting the true facts regarding American Public, their control over, and/or receipt and/or modification of American Public's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning American Public, participated in the fraudulent scheme alleged herein.

109.    Defendants knew and/or disregarded with severe recklessness the falsity and misleading nature of the information that they caused to be disseminated to the investing public.  The

ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including each of the Individual Defendants.

110.    Not coincidentally, just prior to the partial revelation of American Public's true financial condition, Company insiders, including the Individual Defendants, took advantage of Defendants' falsely positive statements and sold Company stock to generate more than $4 million in insider trading proceeds.  The Individual Defendants' sales, as well as those of another Company insider, are demonstrated in the chart below.  Notably, each of the trades occurred above $40 per share – a far cry from the $28.96 closing price on August 6, 2010, when the truth was partially revealed:

| Last Name | First Name | Position | Date | Shares Sold | Price | Proceeds |
|-----------|-----------|----------|------|-------------|-------|----------|
| BOSTON | WALLACE | CEO | 03/11/10 | 20,000 | $45.00 | $900,000 |
| | | | 03/15/10 | 5,000 | $44.34 | $221,700 |
| | | | 04/15/10 | 5,000 | $45.49 | $227,450 |
| | | | 05/17/10 | 3,689 | $43.74 | $161,357 |
| | | | 05/17/10 | 1,311 | $44.93 | $58,903 |
| | | | 06/15/10 | 4,166 | $45.46 | $189,386 |
| | | | 06/15/10 | 834 | $46.14 | $38,481 |
| | | | 07/15/10 | 4,600 | $42.60 | $195,960 |
| | | | 07/15/10 | 400 | $43.83 | $17,532 |
| | | | | 45,000 | | $2,010,769 |
| | | | | | | |
| MCCLUSKEY | FRANK | Executive VP | 06/11/10 | 15,000 | $47.27 | $709,050 |
| | | | 07/23/10 | 14,794 | $45.00 | $665,730 |
| | | | | 29,794 | | $1,374,780 |
| | | | | | | |
| WILKINS | HARRY | CFO | 02/25/10 | 500 | $42.54 | $21,270 |
| | | | 03/25/10 | 500 | $44.73 | $22,365 |
| | | | 04/15/10 | 2,000 | $45.27 | $90,540 |
| | | | 04/26/10 | 500 | $45.61 | $22,805 |
| | | | 05/17/10 | 2,000 | $44.86 | $89,720 |
| | | | 05/25/10 | 500 | $41.20 | $20,600 |
| | | | 06/15/10 | 2,000 | $45.59 | $91,180 |
| | | | 06/25/10 | 500 | $45.56 | $22,780 |
| | | | 07/15/10 | 2,000 | $43.78 | $87,560 |
| | | | 07/26/10 | 500 | $46.23 | $23,115 |
| | | | | 11,000 | | $491,935 |

111.    What Defendants knew, but the market did not, was that the Company's positive financial results during the early part of the Class Period, as well as its financial guidance for 2010

and 2011, did not incorporate the changed competitive market conditions resulting from American Public's for-profit rivals delving into the military education marketplace.

## LOSS CAUSATION/ECONOMIC LOSS

112.   During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of American Public common stock and operated as a fraud or deceit on Class Period purchasers of American Public stock by misrepresenting the Company's business and prospects.  Later, when the Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of American Public common stock fell precipitously, as the prior artificial inflation came out.  As a result of their purchases of American Public common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws when the artificial inflation was released at the end of the Class Period.

113.   As a result of Defendants' materially false and misleading statements and documents, as well as the adverse, undisclosed information known to the Defendants, Plaintiffs and other members of the Class relied, to their detriment on such statements and documents, and/or the integrity of the market, in purchasing their American Public common stock at artificially inflated prices during the Class Period.  Had Plaintiffs and the other members of the Class known the truth, they would not have taken such actions.

114.   As explained herein, these false statements directly or proximately caused, or were a substantial contributing cause of, the damages and economic loss suffered by Plaintiffs and other members of the Class, and maintained the artificial inflation in the prices of American Public common stock throughout the Class Period until the truth was partially revealed to the market, at which time the prior inflation came out of the stock.  Defendants' false and misleading statements

had the intended effect and directly and proximately caused, or were a substantial contributing cause, of American Public's stock trading at artificially inflated levels throughout the Class Period.

115.    Nevertheless, the market's expectations were ultimately corrected on August 4th and 5th, 2010, when the GAO report was issued, when several US Senators issued a press release containing their letter to Secretary Gates, and when Defendants abruptly withdrew their touted and recently reaffirmed guidance for 2010 and 2011, pointing to unexpected declines in military enrollment.  Despite blaming the Company's woes on increased deployment – which Defendants previously told the market the Company took into account and had "tremendous visibility" on – it was clear to the market that the Company's credibility had been destroyed and that an increased and shifting competitive landscape had eroded the Company's core strength and weakened its financial condition.  These disclosures had a devastating effect on the price of American Public stock, as it fell by 35% to close at $28.96 on August 6, 2010, a decline of 40% from its Class Period high.

116.    The timing and magnitude of the decline in American Public common stock negates any inference that the losses suffered by Plaintiffs and other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiffs and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate the price of American Public common stock and its subsequent decline in value as Defendants' prior misrepresentations and other ongoing fraudulent conduct were revealed through a partial disclosure, market expectations were corrected, and the artificial inflation came out of the price of American Public common stock.

117.    In addition, the decline in price of American Public common stock was a natural and probable consequence of Defendants' fraud and should have been foreseen by Defendants in light of the attending circumstances.  The market reactions to the disclosure of American Public's true

financial condition and future business prospects were foreseeable to Defendants and well within the "zone of risk" concealed by Defendants' fraudulent conduct.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

118.    At all relevant times, the market for American Public common stock was an efficient market for the following reasons, among other things:

(a)    American Public stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, American Public filed periodic public reports with the SEC; and

(c)    American Public regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

119.    As a result, the market for American Public common stock promptly digested current information regarding American Public from all publicly-available sources and reflected such information in American Public's stock prices.  Under these circumstances, all purchasers of American Public common stock during the Class Period suffered similar injury through their purchase of American Public common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

120.    The federal statutory safe harbor provision, which provides for forward-looking statements under certain circumstances, does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements,

there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of American Public who knew that those statements were false when made. Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

121.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.  This claim is asserted against all Defendants.

122.    During the Class Period, American Public and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of American Public common stock; and (iii) cause Plaintiffs and other members of the Class to purchase American Public common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, American Public and the Individual Defendants, and each of them, took actions set forth herein.

123.    These Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (iii) engaged in acts, practices, and a course of business which operate as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for American Public common stock in violation of §10(b) of the Exchange Act and Rule 10b-5.  These Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued as controlling persons of American Public, as alleged below.

124.    In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §§210.01 *et seq.*) and S-K (17 C.F.R. §§229.10 *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, surveillance, financial condition and operational performance, so that the market prices of the Company's common stock would be based on truthful, complete and accurate information.

125.    American Public and each of the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of American Public as specified herein.

126.    These Defendants each employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of American Public's value and performance, financial and operational growth, which included the making of, or the participation in

the making of, untrue statements of material facts and omitting to state necessary facts in order to make the statements made about American Public and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of American Public common stock during the Class Period.

127.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: a) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; b) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial performance, projections and/or reports; and c) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which each knew or disregarded with severe recklessness was materially false and misleading.

128.    Each of these Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severely reckless disregard for the truth in that each failed to ascertain and to disclose such facts, even though such facts were available to each of them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or with severe recklessness and for the purpose and effect of concealing  American Public's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' misstatements of the Company's financial condition and performance throughout the Class Period, each of the Individual Defendants, if he did not have actual knowledge of the misrepresentations and omissions alleged, was severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false and misleading.

129.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of American Public's common stock were artificially inflated during the Class Period.  In ignorance of the fact that market prices of American Public's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or disregarded with severe recklessness by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired American Public common stock during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the stock price decline on or about August 6, 2010, when the artificial inflation was released from American Public stock.

130.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known of the true performance, future prospects and intrinsic value of American Public, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their American Public common stock during the Class Period, or they would not have done so at the artificially inflated prices which they paid.

131.    By virtue of the foregoing, American Public and the Individual Defendants have each violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

132.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, as evidenced by, among others, the stock price

decline on or about August 6, 2010, when the artificial inflation was released from American Public stock.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against the Individual Defendants

133.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.  This claim is asserted against the Individual Defendants.

134.    Each of the Individual Defendants acted as a controlling person of American Public within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's fraudulent marketing and promotions and actual performance, each of the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

135.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.

136.    As set forth above, American Public and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, each of the Individual Defendants is liable pursuant to §20(a) of the Exchange

Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of American Public common stock during the Class Period, as evidenced by, among others, the stock price declines on or about August 6, 2010, when the artificial inflation was released from American Public stock.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment as follows:

(a)     Determining this action is a proper class action and designating Lead Plaintiffs as class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  January 25, 2011                    STEVEN F. WHITE PLLC
                                            STEVEN F. WHITE (SBID #4021)


                                            _s/ Steven F. White_
                                            STEVEN F. WHITE

                                            405 Capitol Street, Suite 908
                                            Charleston, WV  25301
                                            Telephone:  304/720-1400
                                            304/346-6731 (fax)

                                            _Liaison Counsel for Plaintiff_

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID J. GEORGE
ROBERT J. ROBBINS
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

KAHN SWICK & FOTI, LLC
KIM MILLER
500 5th Avenue, Suite 1810
New York, NY  10110
Telephone:  212/696-3730
504/455-1498 (fax)

*Lead Counsel for Plaintiff*

CYPEN & CYPEN
STEPHEN H. CYPEN
777 Arthur Godfrey  Road, Suite 320
Miami Beach, FL  33140
Telephone:  305/532-3200
305/535-0050 (fax)

*Additional Counsel for Plaintiff*