**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**


**DOUGLAS N. GAER, Individually and on
Behalf of All Others Similarly Situated,**

       Plaintiffs,

**v.**                                     **Civil Action No. 3:10-CV-81
(Bailey)**

**AMERICAN PUBLIC EDUCATION, INC., et
al.,**

       Defendants.


**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

**I.**    **Introduction**

       Pending before this Court is the Motion to Dismiss by Defendants American Public

Education, Inc., Wallace E. Boston, Jr., and Harry T. Wilkins [Doc. 59], which was filed on

March 10, 2011.  Following an extended briefing period, the plaintiffs filed their response

in opposition [Doc. 61] on April 25, 2011, and defendants filed their reply [Doc. 62] on May

16, 2011.  The defendants also filed a Notice of Supplemental Authority in Support of

Motion to Dismiss [Doc. 63] on October 7, 2011.  Having been fully briefed, the Motion to

Dismiss is now ripe for disposition.  For the reasons more fully stated below, the Motion to

Dismiss [Doc. 59] is **GRANTED**.

II.     **Factual and Procedural History**

## A.     The Class

On August 12, 2010, Douglas Gaer ("Gaer") filed this class action against defendants American Public Education, Inc. ("APEI" or "the Company") and certain officers and directors of the Company (collectively, "defendants"), alleging certain violations of the federal securities laws.  The plaintiffs in this class action (the "Class Plaintiffs") represent all purchasers of the publicly traded common stock of APEI during the Class Period, which spans from February 22, 2010, to August 5, 2010.  On October 12, 2010, putative class member City of Miami Fire Fighters' and Police Officers' Retirement Trust (the "Retirement Trust"), pursuant to § 21D of the Securities Exchange Act of 1934 and 15 U.S.C. § 78u-4(a), filed a motion seeking appointment as lead plaintiff and approval of its selection of Robbins Geller Rudman & Dowd LLP ("RGRD") as lead counsel and Steven F. White PLLC as liaison counsel in this action.  No other putative class member filed a motion to be appointed as lead plaintiff; however, on October 29, 2010, Gaer filed an opposition to the Retirement Trust's motion for appointment as lead plaintiff and requested that the Court appoint him as lead plaintiff.  Prior to any ruling, the Retirement Trust and Gaer reached an agreement for their joint appointment as lead plaintiff.

On January 25, 2011, the "Class Plaintiffs" filed their Consolidated Amended Complaint for Violation of the Federal Securities Laws [Doc. 56].  Count I alleges violations of Section 10(b) of the Exchange Act and Rule 10b-5 against all defendants.  Count II alleges violations of Section 20(a) of the Exchange Act against defendants Boston and

2

Wilkins.[1]

## B.      The Defendants

APEI is a for-profit provider of online post-secondary education that has traditionally focused on serving the military and public service communities.  American Public University System ("APUS"), wholly owned by APEI, is comprised of two universities:  American Military University ("AMU") and American Public University ("APU").  Compl. at ¶¶ 3, 40. APEI offers degree and certificate programs in various disciplines, including national security, military studies, homeland security, and criminal justice.  Id. at ¶ 40.  As a for-profit institution of higher education, APEI primarily derives its revenues from student tuition, many of whom are active-duty military members and veterans.  Id. at ¶ 3.  The majority of these students receive federally-funded student aid.

Prior to the start of the Class Period, APEI's course enrollments, or net course registrations, representing the aggregate number of classes in which students remain enrolled after the date by which they may withdraw from courses without financial penalty,

---

[1]  The plaintiffs' original Complaint [Doc. 1] alleged a completely different theory based in fraud.  The basis of that Complaint asserted that the statements in the February 22, 2010, 10-K filing were materially false and misleading not because they failed to disclose an alleged fundamental change in competitive landscape (as the Amended Complaint alleges), but rather because (1) APEI had "propped up [its] results by fraudulently inducing students to enroll in [its] . . . programs and engaged in other manipulative recruiting tactics;" (2) "[APEI] had materially overstated the company's growth prospects by failing to properly disclose that [it] had engaged in illicit and improper recruiting activities, which also had the effect of artificially inflating [its] reported results and future growth prospects;" and (3) "[t]hroughout the Class Period, it was also not true that APEI had adequate systems of internal operational or financial controls, such that APEI's reported operational statements and foreseeable growth prospects were true, accurate, or reliable;" and (4) "[a]s a result of the[se] . . . adverse conditions which defendants failed to disclose, throughout the Class Period, defendants lacked any reasonable basis to claim that APEI was operating according to plan, or that [it] could achieve guidance sponsored and/or endorsed by defendants."  These claims have since been abandoned.

increased a compound annual growth rate ("CAGR") of 48% from 2007 to 2009.  Id. at ¶ 41.  Over that same time period, APEI's total revenue increased at a CAGR of 47%, from $69.1 million in 2007, to $149.0 million in 2009.  Id.  Net course registrations increased by 55% in 2009, over 2008, and revenue increased from $107.1 million to $149.0 million, or by 39%, over the same time period, while operating margins likewise increased to 26.8% from 24.0%.  Id.

### C.    The "90-10 Rule"

The vast majority of APEI's net revenue comes from students using Department of Defense ("DOD") and Veterans Affairs ("VA") tuition assistance, which does not count as federal taxpayer money received pursuant to the 90-10 Rule.  Id. at ¶ 44.  According to the Department of Education ("DOE"), "the 90-10 Rule states, simply, that a for-profit institution of higher education may not receive more than 90% of its revenue from federal Title IV [of the Higher Education Act] grants and loans."  Id. at ¶ 6.  The 90-10 Rule is not a new concept.  It was implemented by Congress in 1998, as an amendment to the previous 85-15 Rule of 1992.  Thus, assuming an efficient market, this regulation is well established and known to informed investors.

On June 30, 2008, Congress passed the Post-9/11 Veterans Educational Assistance Act of 2008 ("Post-9/11 GI Bill"), which provides that almost all service members, including reserve troops who served a minimum of ninety (90) days active duty after September 10, 2001, are eligible for educational benefits for up to thirty-six (36) months at an average of $458 per credit hour.  Additionally, the Post-9/11 GI Bill created a uniform method to pass on or share the educational benefit with spouses and children.  Id.  In 2008, Congress also expanded the existing aid available to active duty service members through the DOD tuition

4

assistance program by creating the Military Spouse Career Advancement Accounts ("MyCAA") program for military spouses.  In effect, because DOD and VA tuition assistance does not count as federal taxpayer money received pursuant to the 90-10 Rule, recruiting active-duty members of the military would help at-risk for-profit competitors keep the 90-10 Rule at bay.

### D.    APEI's Traditional Business Model and Its Competitors' Response to the Post-9/11 GI Bill

As a large provider of military-based higher education, APEI traditionally focused on recruiting active-duty military personnel and veterans, whereas many of its for-profit competitors primarily focused on civilians.  The spike in growth of for-profit schools, however – which enrollment increased 236% between 1998-99 and 2008-09 – led to vast increases in Title IV lending, hitting $4.3 billion in Pell Grants in the 2008-09 academic year, with an additional $20 billion in federal student loans.  Id.  Thus, plaintiffs allege that leading up to and during the Class Period, APEI's competitors received a large majority of their rapidly expanding revenues from Title IV funds, putting them on the cusp of violating the 90-10 Rule.  Id.

Recognizing the opportunity to avoid violating the 90-10 Rule afforded them by targeting active-duty military personnel and veterans – as well as the increased funding made available by the Post-9/11 GI Bill – Class Plaintiffs allege that APEI's for-profit competitors began aggressively pursuing military and veteran students prior to and during the Class Period in an effort to bolster the 10% side of the 90-10 calculus.  Id. at ¶ 51.  As a result, the Class Plaintiffs assert that the defendants were aware that APEI's market-leading position in the military for-profit education segment was subject to encroaching

competition during the Class Period.  Id. at ¶ 52.  The Class Plaintiffs assert this rising competition for military students undercut APEI's ability to sustain its traditional growth in military course registrations, which would in turn drive down its stock price.

While the rate of growth for APEI's total military educational benefits received decreased every year, the vast majority of its competitors increased, especially during 2009 and 2010, when the increases were frequently by several hundred, or even several thousand percent.  Id. at ¶ 57.[2]  APEI saw only a 15% increase in DOD benefits received in 2010, compared to 2009, down from a 31% gain in 2009, and a 53% increase in 2008. Id.  Thus, Class Plaintiffs allege the defendants knew this erosion of APEI's military-based enrollment was not merely a future potential risk, but was an actual, present reality.  Id.

### E.   For-Profit Institutions of Higher Education Come Under Increased Government Scrutiny

While APEI allegedly faced increasing competition, the for-profit education industry fell under ever increasing scrutiny on many fronts – from extremely low graduation rates to excessively high student loan default rates.  Id. at ¶ 46.  On June 10, 2010, Senator Tom Harkin, chair of the United States Senate's Health, Education, Labor and Pensions Committee, announced he would hold a series of hearings to examine federal spending at for-profit colleges.  Id.  On June 16, 2010, the United States Department of Education ("DOE") announced it was proposing new, tougher regulations on the industry, which were

---

[2] This Court recognizes these figures represent *percentage* increases, which figures can easily be manipulated to inflate perception of actual growth based on, for instance, actual dollar figures.  For example, an increase of 2000% – while appearing impressive – could represent a dollar increase from $100 to only $2,000.  Thus, it is inherent that companies entering new segments (if successful) will experience high percentage growth.

designed to protect college students and taxpayers from abusive or fraudulent practices. On June 24, 2010, the Senate held the first of its hearings entitled "Emerging Risk?  An Overview of the Federal Investment in For-Profit Education."  Id. at ¶ 48.  Then, on July 23, 2010, the DOE proposed a measure to penalize for-profit colleges for graduating students with high debt-to-income ratios.  Id.

On August 4, 2010, the United States Government Accountability Office ("GAO") issued a report detailing its undercover operation on the recruiting techniques employed by certain for-profit colleges.  Id. at ¶¶ 49, 92.  The GAO's report cited many instances of abuse in the sector, finding that many of the companies in the industry employed fraudulent and deceptive practices in their student recruitment by targeting students who used federal financial aid to pay for their schooling.  Id. at ¶ 49.  The study was presented at a Senate education hearing held on August 4, 2010, as part of an ongoing inquiry into the for-profit education sector.  Id.

Also, on August 4, 2010, Senators Dick Durbin, Jim Webb, Tom Harkin, and others, issued a press release containing the contents of letters sent to Defense Secretary Robert Gates and Secretary of Veterans Affairs Eric K. Shinseki seeking answers regarding the federal investment in for-profit colleges in light of reports that for-profit colleges were aggressively targeting military personnel and veterans.  Not only did the August 4, 2010, letters and press release reveal that APEI was under scrutiny, they highlighted reports that other for-profit institutions, which included APEI's competitors, had been "aggressively targeting military personnel," APEI's traditional core source of revenues.  Id.  It was these types of deceptive and aggressive recruiting practices which formed the basis of the Class Plaintiffs' original Complaint.

Following the close of the Class Period, on December 8, 2010, the United States Senate Health, Education, Labor and Pensions Committee issued a report entitled "Benefitting Whom?  For-Profit Education Companies and the Growth of Military Education Benefits."  Id. at ¶ 55.  The report included a list of for-profit colleges with their respective military education benefits received, which indicated APEI received more military education benefits than any other school.  Id.

<u>**F.      Class Plaintiffs' Allegations**</u>

APEI's market-leading position in the military for-profit education segment declined during the Class Period.  Id. at ¶¶ 10, 11, 52.  The crux of the Class Plaintiffs' Amended Complaint alleges that the defendants knew or deliberately disregarded that, prior to and during the Class Period, APEI's competitors increasingly focused on expanding their military student enrollment.  Id.

At the start of the Class Period, however, Class Plaintiffs alleged that despite the problems impacting APEI's enrollment, defendants assured the market that APEI would continue to grow.  APEI also provided outlook for the year 2010, which included a 35-38% increase in net course registrations year-over-year and estimated that net course registrations would increase 32-35% for 2011. Id. at ¶ 62.  APEI also reassured the market that it stayed informed of any significant military deployments and factored deployments into its guidance. Id. at ¶ 64.  Similarly, on May 6, 2010, APEI reiterated its 2010 guidance for revenue growth and net course registrations and increased its net income guidance to between 36% and 39% year-over-year.  Id. at ¶ 76.

Three months later, on August 5, 2010, APEI downgraded its revenue and earnings guidance for the third quarter of 2010, and withdrew guidance for full year 2010.  Id. at ¶

8

93.  APEI revealed "adverse changes" in net course registrations of its active-duty military students at AMU as a result of increased deployments and announced plans to increase APEI's focus on the civilian market, rather than the military market.  Id. at ¶ 94.  In response to this news, the price of APEI stock decreased by 32%.  Id. at ¶ 104.

## III.   Applicable Law

In passing the Private Securities Litigation Reform Act ("PSLRA") in 1995, Congress imposed heightened pleading requirements for private securities fraud actions.  Under § 10(b) of the Securities Exchange Act, it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . .."  15 U.S.C § 78(j)(b).  In enacting the PSLRA, Congress essentially responded to evidence of abusive practices committed in private securities litigation and sought to curtail frivolous litigation.  *See Teachers' Ret. Sys. of Louisiana v. Hunter*, 477 F.3d 162, 171-172 (4th Cir. 2007).

Pursuant to § 10(b), the SEC has promulgated Rule 10b–5, which forbids employing "any device, scheme, or artifice to defraud, . . . mak[ing] any untrue statement of a material fact or omit[ting] to state a material fact . . . or . . . engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. § 240. 10b–5.  "Section 10(b) creates a private right of action for purchasers or sellers of securities who have been injured by the statute's violation.  *See, e.g.*, *Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n. 9 (1971)."  *Pub. Employees' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305,

311 (4th Cir. 2009).

A plaintiff in a Section 10(b) private action must typically prove: "'(1) a material misrepresentation or omission by the defendant; (2) *scienter*; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation' (that is, the economic loss must be proximately caused by the misrepresentation or omission). ***Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.***, 552 U.S. 148 (2008) (emphasis added)." ***Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.***, 576 F.3d 172, 181 (4th Cir. 2009).

## IV.    Discussion

### A.    Section 10(b) Claims

#### 1.    Material Misrepresentation

In any private action arising under Section 78u-4(b)(1) in which the plaintiff alleges that the defendant –

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made,

in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

10

15 U.S.C. § 78u–4(b)(1).

"Thus, plaintiffs must allege: (1) each misleading statement; (2) the reasons each statement was misleading; and (3) when an allegation regarding such a statement is based on information and belief, 'with particularity **all facts** on which that belief is formed.'" *Teachers'*, 477 F.3d 162, 173 (emphasis in original).  The *Teachers'* Court explained:

> The PSLRA's "all facts" standard, however, changes the relevant set of facts for alleging misrepresentations and omissions to those alleged in the complaint.  Under the PSLRA, therefore, our inquiry becomes whether, if those facts alleged in the complaint are true, relief could be granted on the plaintiffs' claim.  Stated another way, we must ascertain whether the complaint states *sufficient facts* to permit a *reasonable* person to find that the plaintiff satisfied this element of his claim—that the defendant made a false or misleading statement.

> If the plaintiff fails to allege *all* facts but does allege *sufficient facts* to support a *reasonable belief* in the allegation that the defendant's statement was misleading, the court should deny the Rule 12(b)(6) motion as to this "misrepresentation" element.  *See, e.g.*, *Novak v. Kasaks*, 216 F.3d 300, 313–14 (2d Cir. 2000); *see also Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) (endorsing *Novak's* standard); *California Pub. Employees' Retirement Sys. v. Chubb Corp.*, 394 F.3d 126, 146 (3d Cir. 2004) (same); *Adams v. Kinder–Morgan, Inc.*, 340 F.3d 1083, 1099 (10th Cir. 2003) (same).  This construction of § 78u–4(b)(1) logically follows from the inquiry required by Rule 12(b)(6), which tests only the *legal sufficiency* of the complaint.

> Determining whether the complaint satisfies this standard necessarily entails a case-by-case assessment of the complaint as a whole.  We will consider the number and level of detail of the facts; the plausibility and

11

coherence of the facts; whether sources of the facts are disclosed and the apparent reliability of those sources; and any other criteria that inform how well the facts support the plaintiff's allegation that defendant's statements or omissions were misleading.  *See **Adams***, 340 F.3d at 1102–03; ***Chubb Corp.***, 394 F.3d at 147–55.

477 F.3d at 173-176 (emphases in original).

The Amended Complaint at issue here adequately specifies the statements – albeit piecemeal – alleged to have been misleading. Indeed, it identifies several publically issued statements released over several months during the Class Period.  But after listing each alleged misleading statement, the Amended Complaint simply speculates why the statement was misleading.  The facts – or lack thereof – alleged in support of these formulaic reasons fail to support a reasonable belief that the statements were in fact misleading, and therefore, this Court concludes that the Amended Complaint fails to satisfy the PSLRA and Rule 12(b)(6)'s requirement that the Complaint shall state with particularity sufficient facts on which a reasonable belief can be formed.  This became clear when the Court undertook a comprehensive, holistic view of all the statements alleged and the facts supporting the allegations about each statement, which are more fully set forth below.

First, on February 22, 2010, American Public hosted a conference call with investors, media representatives and analysts to discuss its fourth quarter and full year 2009 results, as well as its expectations for 2010. Boston and Wilkins participated in the call on behalf of APEI, in their capacities of CEO and CFO, respectively.  Plaintiffs allege that during the call, numerous false and misleading statements were made. For example, Boston stated, in part (Compl. ¶ 63):

12

Switching to slide number four, last year we continued to see strong interest from both military and civilian students.  For the full year of 2009, net course registrations from students using Title IV increased 90%, and net course registrations from active duty military students increased 31%.  We are very pleased by these results.  APUS is the largest provider of higher education to active-duty military, with tremendous visibility and strong relationships within the military community.  The characteristics and strategies that made us so successful with military students is also beginning to work well in civilian markets.   We are finding that information about our quality, affordability and unique academic offerings also resonates well within the civilian communities we serve.

In that same conference call, Boston stated (Compl. ¶ 65):

We believe we have continued to gain share in every branch of service; even if we're number one, that we're still continuing to gain actual share inside the military, and you can see that even on a very large number that we finished 2008 at, we ended up with a 31% enrollment growth with the military, which we were very pleased with.  So, you know, once we receive the official numbers, we'll make sure that we put them out in a press release so that everybody can see them.

The critical concern in the case at hand is the first of these factors the plaintiffs in a Section 10(b) action must prove regarding each misleading statement, which itself has two components: (a) a false statement or omission of a fact (b) that is material.  In ***Basic Inc. v. Levinson***, 485 U.S. 224 (1988), the Supreme Court set forth the starting point for any analysis of this factor.  There, the Court devoted much of its attention to the "materiality requirement" and held that in order "to fulfill the materiality requirement" in the § 10(b) and Rule 10b-5 context "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the

'total mix' of information made available." *Id*. at 231-32 (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).  Thus, materiality is a "fact specific inquiry," which "depends on the significance the *reasonable* investor would place on the withheld or misrepresented information." *Id*. at 240 (footnote omitted) (emphasis in original).  With respect to "contingent or speculative information or events," materiality "'will depend . . . upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'" *Id*. at 238 (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968) (*en banc*), *cert. denied sub nom.*, *Coates v. SEC*, 394 U.S. 976 (1969)).

In its discussion of the materiality requirement, the Court also emphasized that in order to meet its burden under this first factor "a plaintiff must show that the statements were *misleading* as to a *material* fact," *Id*. (emphasis in original), and that "[t]o be actionable, of course, a statement must also be misleading." *Id*. at 239 n. 17.  Moreover, all averments of fraud are required by Fed.R.Civ.P. 9(b) to be "stated with particularity." Where fraudulent projections are alleged, the plaintiffs must therefore identify in the Complaint with specificity some reason why the discrepancy between a company's optimistic projections and its subsequently disappointing results is attributable to fraud. *Borow v. nVIEW Corp.*, 829 F.Supp. 828, 833 (E.D. Va.1993), *aff'd mem.*, 27 F.3d 562 (1994).  Mere allegations of "fraud by hindsight" will not satisfy the requirements of Rule 9(b).  *Borow*, 829 F.Supp. at 833.  For this reason, "[m]isstatements or omissions regarding actual *past* or *present* facts are far more likely to be actionable than statements regarding projections of *future* performance." *Hilson*, 42 F.3d at 212 (citing *Malone v.*

14

*Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994) (emphasis in original).

To further provide protection, the PLSRA's "safe harbor" was designed to encourage corporate managers to provide forward-looking information to investors without the chilling effect such litigation produces.  This "safe harbor" provision applies to forward-looking statements to immunize defendants from liability provided the statement is identified as such and is accompanied by meaningful cautionary language, or is immaterial, or the plaintiff fails to show that the statement was made with actual knowledge of its falsehood. 15 U.S.C. § 78u-5(c)(1).  In addition, "[i]n order to be meaningful, defendants' cautionary language . . . should be enough to properly warn an investor of significant risks similar to that actually realized so as to put the investor on notice."  *In re Lab. Corp. of America Holdings Secs. Litig.*, 2006 WL 1367428 *5 (M.D. N.C. 2006).

The plaintiffs point to three specific statements including a February 22, 2010, Press Release, filed with a Form 8-K with the United States Securities and Exchange Commission ("SEC"), which reports APEI's fourth quarter and full year 2009 financial results.

With regards to the February 22 Press Release, the defendants correctly note that the Amended Complaint takes certain excerpts out of context by omitting the very cautionary language which the safe harbor seeks to protect.  The relevant text in the release reads as follows (Compl. ¶ 62):

**Full Year 2010 and 2011 Outlook:**

15

The following statements are based on current expectations.   These statements are forward-looking and actual results may differ materially.

- Net course registrations to increase between 35% and 38% year-over-year

- Revenues to increase between 36% and 39% year-over-year

- Net income to increase between 36% and 37% year-over-year

For fiscal year 2011, the Company currently anticipates net course registrations will increase approximately 32% to 35% year-over-year

This same press release also contains the following cautionary language:

## Safe Harbor Statement

Statements made in this press release regarding American Public Education, or its subsidiaries, that are not historical facts are forward-looking statements based on current expectations, assumptions, estimates, and projections about American Public Education and the industry.  These forward-looking statements are subject to risks and uncertainties that could cause actual future events or results to differ materially from such statements.  Future-looking statements can be identified by words such as "anticipate", "believe", "could", "estimate", "expect", "intend", "may", "should", "will" and "would".  These forward-looking statements include, without limitation, statements regarding expected growth.  Actual results could differ materially from those expressed or implied by these forward-looking statements as a result of various factors, including the various risks described in the "Risk Factors" section and elsewhere in the Company's Annual Report on Form 10-K for the year ended December 31, 2009 as filed with the SEC.  The Company undertakes no obligation to update publicly any forward-looking statements for any reason, even if new information becomes available or other events occur in the future.

See Doc. 60, Ex. 2.

Nor can the Class Plaintiffs suggest that APEI failed to disclose or recognize the nature of its competitive landscape.  In both its 2009 Annual Report and Form 10-K, APEI specifically addresses its competition:

16

Competition

There are more than 4,000 U.S. colleges and universities serving traditional college age students and adult students.  Competition is highly fragmented and varies by geography, program offerings, delivery method, ownership, quality level, and selectivity of admissions.  No one institution has a significant share of the total postsecondary market.  Within our primary military market, there are more than 1,000 institutions that serve military students and receive tuition assistance funds.  Our primary competitors for military students are other institutions offering bachelor's and master's degrees and traditional colleges and universities located near military installations.

We compete with not-for-profit public and private two-year and four-year colleges as well as other for-profit schools, particularly those that offer online learning programs.  Public and private colleges and universities, as well as other for-profit schools, offer programs similar to those we offer.  Public institutions receive substantial government subsidies, and public and private institutions have access to government and foundation grants, tax-deductible contributions and other financial resources generally not available to for-profit schools.  In addition, some of our competitors, including both traditional colleges and universities and other for-profit schools, have substantially greater name recognition and financial and other resources than we have, which may enable them to compete more effectively for potential students.  We also expect to face increased competition as a result of new entrants to the online education market, including established colleges and universities that had not previously offered online education programs.

The primary competitive factors for institutions targeting working adult students include:  specific degree program offerings; affordability, including tuition and fees and rates of increase; convenience and flexibility, including availability of online courses; reputation and academic quality; and marketing effectiveness.

See Doc. 60, Ex. 3 at pp. 10-11.

Furthermore, the Form 10-K states that:

Strong competition in the postsecondary education market, especially in the online education market, could decrease our market share and increase our cost of acquiring students.

Following this statement, APEI repeats word-for-word the above-quoted language

17

from Exhibit 3 at pp. 10-11.

In their Amended Complaint, the Class Plaintiffs specify a host of statements which they identify as misleading.  Each will be listed below, followed by a brief recitation as to this Court's findings regarding the sufficiency of the alleged misrepresentation and its materiality.  In so doing, this Court has reviewed each statement in the Complaint by applying the Fourth Circuit Court of Appeals' *Teachers'* analysis; that is, to identify (1) each misleading statement; (2) the reasons each statement was misleading; and (3) when an allegation regarding such a statement is based on information and belief, 'with particularity **all facts** on which that belief is formed.'" *Teachers'*, 477 F.3d 162, 173 (emphasis in original).

As a preface, this Court notes the Amended Complaint clearly identifies each statement believed to be misleading and states reasons why they believe the same to be misleading; however, this Court finds that the Complaint lacks factual support for their proposition that the statements were misleading.

February 22, 2010, conference call (Compl. ¶ 64):

Boston: I -- we really haven't embedded any guidance as far as additional deployments. I mean we -- you know, we gave you our first quarter guidance, and there was a -- an offensive launched in Afghanistan that, you know, I guess theoretically since we know some of the numbers for the first quarter, at least January, you know, and as well as we had soldiers who asked for deferrals because they were deployed to Haiti on rescue missions, but that's kind of typical, and we have already taken that into account. We're not seeing any signs of additional significant deployments anywhere throughout the remainder of the year but, you know, we do stay on top of that and build that into our forecast.

18

> Wilkins: And of course if we did have any significant withdrawals that would benefit us, and that's not in the forecast either.

This Court finds no misleading statements contained in the above. APEI disclosed certain deployments to Afghanistan and requests for deferrals for those on rescue missions in Haiti, which it had already accounted for in its guidance. APEI candidly stated that it did not see any signs of additional significant deployments, but noted that it closely monitors such activity. Taken alone, the above statements do not appear misleading, but this Court will continue to view all the statements together to develop a holistic view of the alleged misrepresentations regarding the change in competitive landscape.

In its February 22, 2010, annual financial report Form 10-K, APEI disclosed (Compl. ¶ 69):

> From 2007 to 2009, our total revenue increased from $69.1 million to $149.0 million, which represents a compound annual growth rate (CAGR) of 47%. Our net course registrations increased 55% and 41% in 2008 and 2009, respectively, over the prior periods. We believe our growth is attributable to: (i) high student satisfaction and referral rates; (ii) regional accreditation in May 2006; (iii) increasing acceptance of distance learning within our targeted markets; and (iv) achieving certification to participate in federal student aid programs under Title IV of the Higher Education Act of 1965 beginning with classes starting in November 2006. **As our revenue base grows, we expect our growth rate percentages to continue to decline.** However, we expect actual dollar revenue growth to increase. Net income improved to $23.9 million in 2009 from net income of $8.8 million in 2007.
>
> Approximately 75% of our students serve in the United States military on active duty, in the reserves, or in the National Guard or are veterans. Many of our other students have careers in public service, such as federal, national

and local law enforcement personnel or other first responders. Our programs
are generally designed to help these and other students advance in their
current professions or prepare for their next career. Our online method of
instruction is well-suited to our students, many of whom serve in positions
requiring extended and irregular schedules, are on-call for rapid response
missions, participate in extended deployments and exercises, travel or
relocate frequently and have limited financial resources. Our satisfied
students have been a significant source of referrals for us, which we believe
has led to lower marketing costs among certain of our student populations.
Over 50% of our new students in 2009 who responded to our surveys
indicated that they inquired about enrolling in either AMU or APU as the
result of a personal referral.

(emphasis added).

The Class Plaintiffs assert the above statements referenced in ¶¶ 62-69 were each
materially false and misleading when made as they misrepresented and/or omitted adverse
facts which then existed and disclosure of which was necessary to make the statements
not false and/or misleading.  The true facts, plaintiffs allege, which were allegedly known
then to or recklessly disregarded by each of the defendants were:

1.  The Company's status as the "largest provider of higher education to active-duty
military" was materially threatened and being undermined by the explosive surge in
competition from other for-profit companies in the military and veteran student population.

2.  It was misleading to highlight the Company's purported "tremendous visibility"
with its military students because it further hid and omitted the critical fact that the
competitive environment in which American Public operates had dynamically shifted as the
largest for-profit companies in the country aggressively sought to encroach on the

Company's market share in an effort to further insulate themselves from running afoul of the 90-10 Rule.

3.  As a result of the foregoing, the Company's market share gains, to the extent they existed, were slowing or poised to slow dramatically.

4.  By highlighting the reasons behind the Company's growth, the Company's 2009 Form 10-K was materially misleading because it omitted critical information concerning American Public's current competitive landscape.

This Court is compelled to highlight an explicit, dispositive statement disclosed by APEI, which the Class Plaintiffs understandably chose to ignore:  "As our revenue base grows, we expect our growth rate percentages to continue to decline."  Compl. ¶ 69.  The Amended Complaint repeatedly attacks APEI's growth rates and categorizes this decline as fraud; however, APEI, by issuing this statement, acknowledges its inability to maintain growth rate percentages inherent of large, established corporations.

The remaining reasons proffered above belabor the common theme that APEI failed to disclose a fundamental change in its competitive landscape as a result of its competitors shifting their focus from civilian to military students in an attempt to comply with the 90-10 Rule.  While this is certainly a regulation to which all such for-profit educational institutions must stay abreast, the Amended Complaint fails to allege *facts* sufficient to support the Class Plaintiffs' claims that APEI's statements – or omissions –  were misleading in this regard.  *See* **Teachers'**, 477 F.3d at 173.  This theory fails for three reasons:  First, at the relevant time the above statements were made, APEI was meeting its guidance.  Second, it would seem inapposite to suggest a fundamental change in the competitive landscape of an entire industry would only affect one quarter's earnings.  Finally, the Class Plaintiffs

21

repeatedly attribute this alleged change in competitive landscape in the military segment as a necessity for APEI's competitors to comply with the 90-10 regulations.  As previously stated, this is certainly something for both companies and investors to keep a close eye on, but more importantly, this Court finds the Amended Complaint devoid of any facts regarding any specific institutions actually in jeopardy of "running afoul of the 90-10 Rule."  Perhaps the most compelling fact which belies the Class Plaintiffs' theory regarding the fundamental change in APEI's competitive landscape in the military segment comes from the August 4, 2010, reports from the GAO which for the first time revealed that APEI's competitors had been aggressively targeting military personnel through deceptive recruiting practices.  The GAO did not disclose the extent to which these deceptive recruitment activities were successful; however, it shows that knowledge of the competitive encroachment on the military segment was not revealed until August.  Without any such information regarding this fact, this Court cannot find a failure by APEI to disclose the same would somehow be misleading.

In a May 6, 2010, press release APEI stated (Compl. ¶ 76):
**Recent Highlights:**

* * *

Net course registrations increased to approximately 64,900 in the first quarter of 2010, a year-over-year increase of 39%.

Net course registrations from new students in the first quarter of 2010 increased to approximately 13,300, an increase of approximately 26% over the same period of 2009.

As of March 31, 2010, a total of approximately 70,600 students were enrolled

in American Public University System, a year-over-year increase of 42%.

Full Year 2010 Outlook:

\* \*

For fiscal year 2010, American Public Education currently estimates the following:
Net course registrations to increase between 35% and 38% year-over-year
Revenues to increase between 36% and 39% year-over-year
Net income to increase between 36% and 39% year-over-year

On a May 6, 2010, APEI conference call with investors, media representatives and analysts, the Company reported (Compl. ¶ 77):

We are pleased with our strong first-quarter results which were ultimately driven by our attention to quality, affordability and student retention, as well as by our focus on creating operational efficiencies. Student enrollment at American Public University System increased 42% year over year to 70,600 students as of the end of the first quarter.

Total net course registration increased 39% and net course registrations from new students increased 26%. These increases in both military and civilian student enrollment are a result of our attractive value proposition for students in the military and civilian sectors, continued improvement in student retention, and an increasing percentage of students returning for a second degree.

Net course registrations from Title IV students, which we believe is a good proxy for civilian student growth, increased 71% to 12,800 in the first quarter of 2010. Furthermore, strong growth in Title IV net course registrations, which now represent 20% of total net course registrations, illustrates that our mix shift to an increased civilian population is proceeding as expected. As of

23

March 31, 2010, approximately 36% of APUS students are civilian, 64% are active duty military.

* * *

Another highlight this quarter is related to the new GI Bill. Net course registrations from new students using veterans' benefits, or VA, increased by more than 100% year over year. Veterans now represent 7% of total net course registrations compared to 4% in the first quarter of 2009. While this corresponds to a small portion of our overall registrations, it illustrates how the new GI Bill is also providing us with a nice tailwind.

In the same May 6 conference call, Wilkins stated (Compl. ¶ 78):

We are reiterating our expectations for net course registration growth of between 35% and 38%, as well as revenue growth of between 36% and 39% for the full year 2010. We also reiterate our long-term view that net course registrations will increase between 32% and 35% in 2011.

Moving to slide nine, in closing we enjoyed a strong first-quarter results with slight financial and operational out-performance. And as a result, we're raising our full year EPS growth outlook. To put our results and guidance in perspective, the graph on slide nine illustrates our past success at executing our unique strategy and approach. This year, as in prior years, we expect our expansion to continue and our University's reputation for quality and affordability to grow.

During the same call, in response to the question "What kind of growth [is the Company] expecting or is incorporating in [its] model for this year on military growth," Boston responded (Compl. ¶ 79):

And as far as guidance for specific military growth for the year, we did not issue that. We do expect to grow but we haven't broken our total growth

24

picture between civilians and military.

In response to another question, Boston stated (Compl. ¶ 80):

So we think that we're on track on the civilian side to continue pretty high growth rates. At the same time we've always said that once we've reached number one market share in the military, that with that much bigger denominator, it would be tougher to grow. But we do expect to continue to grow and we're seeing continued growth in the military.

When asked in what military branches APEI was seeing the most growth, Boston answered (Compl. ¶ 81):

I think our growth has been in all of the branches. We haven't seen a major jump like we saw when we got into the Navy distance learning program. But we're – and we've also seen some, a little bit of fallout with the Marines that were deployed to Afghanistan for that push. As you might know, Afghanistan bases for the Marines really don't have broadband connectivity, and also their level of activity in this current deployment is such that they're kicking down doors and there's really no time for them to study. But while that part, that created a little softness, I think we're continuing to see growth in the other branches.

In regards to the growth in the number of military veteran students, Boston and Wilkins responded (Compl. ¶ 82):

Wilkins: Yes, our VA is up dramatically. It's actually the fastest -- we consider the people getting VA benefits to be civilians. They're not active duty military. And we were up -- we didn't give that number out, but we were up -- it's our fastest growing segment of our civilian population. We're benefiting greatly from Chapter 33. Actually, more than we anticipated.

25

Boston: I think we said it went from 4% to 7%.

Wilkins: Of our total student population, yes. It's about 100% actual growth in terms of net registrations for VA students. . . . A lot faster than the rest of the civilians.

Also, on May 6, 2010, APEI filed its interim quarterly financial report on Form 10-Q for the quarter ending March 31, 2010.  It stated, in relevant part (Compl. ¶ 85):

Approximately 53% of the Company's revenues for the three months ended March 31, 2010, were derived from students who received tuition assistance from tuition assistance programs sponsored by the United States Department of Defense compared to approximately 59% of the Company's revenues for the three months ended March 31, 2009. For the three months ended March 31, 2010, 20%, or approximately 12,800, of our net course registrations were from students using financial aid under the Title IV programs compared to 16%, or approximately 7,500, of our net course registrations for the three months ended March 31, 2009. A reduction in either of these programs could have a significant impact on the Company's operations.

* * *

Net course registrations for the three month period ended March 31, 2010 increased 39% from the three month period ended March 31, 2009. Our revenue increased to $47.3 million from $33.2 million, or by 43%, for the three month period ended March 31, 2010  from the three month period ended March 31, 2009. Operating margins increased to 27.8% from 26.3% for the three month period ended March 31, 2010 compared to the three month period ended March 31, 2009.

With regard to the above statements referenced in ¶¶ 76-85, the Class Plaintiffs allege each were materially false and misleading when made for the reasons set forth in ¶ 71, and the factual detail contained throughout the Amended Complaint.  Additionally, the

26

plaintiffs allege these same statements were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  Class Plaintiffs allege the true facts, which were allegedly known to or recklessly disregarded by the defendants were:

1.   Defendants lacked a reasonable basis for reiterating the Company's 2010 guidance related to revenue growth and new course registration growth. Defendants were fully aware that the competitive landscape in the military for-profit education segment had dramatically shifted, and that increased competition would result in a substantial slowdown in net course registrations for the Company.

2.   For the same reason, defendants lacked a reasonable basis for raising the Company's full-year earnings per share outlook, which further misled the market.

3. By pointing to "continued growth in the military," defendants omitted the material fact that its "number one market share in the military" was being eroded by its competition. Rather than come clean with the market, defendants pointed to supposed growth in "all of the branches."

4.  The decrease in the percentage of the Company's revenues earned from DOD tuition assistance programs was not the mere logical expansion of the Company's foray into the civilian market. Quite the opposite, it was the consequence of the Company's increasing loss of military market share stemming from a demonstrably changed competitive environment.

Again, the Class Plaintiffs rely on the theme that APEI failed to disclose a fundamental change in its competitive landscape as a result of its competitors shifting their

27

focus from the civilian to military market in an attempt to comply with the 90-10 Rule.

Again, this Court finds that at the relevant time the above statements were made, APEI was

meeting its guidance.  Simply put, the numbers were there to support the statements.

Further, this Court is not compelled that a fundamental change in the competitive

landscape of an entire industry would only affect one quarter's earnings.  As the defendants

point out, APEI experienced a significant dip in the third quarter of 2010, but fully

rebounded the following quarter.  Finally, as previously noted, this Court finds the Amended

Complaint devoid of any concrete facts showing some industry-wide problem that these for-

profit institutions were actually in jeopardy of "running afoul of the 90-10 Rule."  Without any

such information, this Court cannot find a failure to disclose the same would somehow be

misleading.

On May 14, 2010, APEI disclosed its Annual Report, including a letter from Boston,

which stated, in part (Compl. ¶ 90):

> From every perspective, we are building a sustainable institution. Our
> emphasis on learning, quality, and customer service translates into academic
> success for our students. And our outreach effort, high referral rates, and
> commitment to affordability translate into high enrollment rates and strong
> growth. In 2009, enrollments increased 41 percent over the prior year. For
> the year, we achieved significant revenue and earnings growth. Revenues
> of $149.0 million in 2009 were up 39 percent form the prior year, and our
> operating income of $39.9 million represents a 55 percent increase over
> 2008 levels.
> Our future is bright. With an enrollment of more than 60,000 students, we are
> the leading provider of higher education to the military and we continue to
> expand among civilian students.

28

The above statement seems to stand alone in the Complaint without any explanation as to whether the Class Plaintiffs believe it to be misleading.  Without any reasons or facts in support, and upon an independent review of the same, this Court fails to see any misleading statements or omissions.

Then, after the market closed on August 5, 2010, APEI issued its second quarter 2010, earnings results, downgrading its earnings guidance for the third quarter and withdrawing its guidance for the rest of year 2010.  The press release stated, in part (Compl. ¶ 93):

> American Public Education has recently observed adverse changes in our historical pattern of growth in net course registrations from active duty military students at AMU. While the Company cannot determine all of the factors that are causing it to occur, American Public Education believes the changes in net course registrations from active duty military students may in part be due to increased operations activity and recent deployments across all branches of the U.S. Military, particularly the United States Marine Corps. The Company believes that increased demands on many active duty military personnel, combined with limited internet access associated with some deployments in Afghanistan and at sea, are likely to limit the ability of certain active duty military students to pursue higher education in the near term. The Company cannot determine whether net course registrations from active duty military students will return to previous expectations, grow more slowly than expected, remain flat or decline.
> As a result, American Public University Systems plans to accelerate its existing strategic plan to address civilian markets through APU, with an emphasis on public service professionals and selected groups of working

adults.

American Public Education is revising guidance for the third quarter of 2010 and is returning to its prior practice of only providing guidance for current periods. Guidance given previously for 2010 and beyond should no longer be relied upon. American Public Education anticipates third quarter 2010 net course registrations to increase between 20% and 22%, revenue to increase between 29% and 31%, and net income to increase between 5% and 10% over the prior year period.

Also on August 5, 2010, APEI hosted a conference call during which the plaintiffs allege numerous false and misleading statements were made (Compl. ¶ 94):

Moving to slide four, Advancing Our Current Strategic Plan, these developments illustrate our success at fulfilling our institutional mission in that our strategic plans are highly effective. We have begun to accelerate existing plans that address civilian markets because we have recently observed changes in the historical pattern of growth in our net course registrations from active duty military students. This began in mid-June 2010 with a slowing in the growth of net course registrations from active duty military, and we cannot be certain whether net course registrations from active duty military students will return to previous expectations, little more slowly than expected remain flat or decline.

We believe that the change in net course registrations from active duty military students is largely due to the increased operations tempo and recent overseas deployments across all branches of the US military, particularly the level of activity in United States Marine Corps.

We suspect that increased demand on many active duty military personnel combined with limited Internet access associated with some deployments is likely to limit the ability of certain active duty military students to pursue higher education in the near term. Our students are heroes and professionals

with very serious jobs that are becoming more difficult as military activity increases and as world events dictate. Over 94,000 troops are currently involved in intense mountain warfare and warfare preparations in Afghanistan according to estimates from the Department of Defense. Several components

of major Army divisions are presently transitioning to and from Iraq and Afghanistan as part of the military's plan for the Afghanistan surge. July was the deadliest month for US troops in the nearly nine-year Afghan war. Troop levels in Afghanistan are expected to raise, while troop levels in Iraq are expected to decline from approximately 92,000 troops. In total, over 290,000 troops are deployed in the Greater Middle East wars, including the Air Force, which is focused on supplying the troops and supporting the transitions.

In addition, several thousands of sailors and marines recently participated in joint military drills near South Korea and another 20,000 sailors and marines are currently involved in RIMPAC, which is the rim of the Pacific international war games, the world's largest maritime exercise, involving 25 Navy ships, submarines, and 14 other nations off the coast of Hawaii.

In the Marine Corps, where AMU has a substantial leadership position, several battalions are in transition or on drills, including deployments to the Horn of Africa. The Coast Guard and many civilians with expertise in emergency and environmental matters are also our students, are also deployed and focused on the Gulf oil spill disaster cleanup and recovery.

Despite what we believe are temporary operational factors softening active duty military participation, we continue to strengthen our brand in the military. However, we cannot fully estimate the extent to which the growth of our net course registrations will be impacted by military activity and we do not know all of the factors that are causing it to occur.

* * *

Turning now to regulatory matters. As an institution of higher learning committed to academic excellence and expanding access to higher education, we support broad and collaborative efforts to improve student

31

outcomes and further the success of our higher education system. While the Department of Education's proposed rules regarding gainful employment contain numerous complexities, our current survey review with the proposed rules and available data leads us to believe that American Public University System will be in compliance with the 8% debt-to-income thresholds.

However, uncertainties still exist regarding the proposed rules and our ability to comply with final rules. While approximately 90% of our students are currently employed, we do not currently track the personal income and median debt loads of all of our APUS students. As a recommended change to the proposed rules, we suggest online institutions be permitted to limit Title IV distributions to direct cost, tuition fees and books.

In closing, while we work through temporary challenges with enrollment of active duty military students, we will accelerate our successful improvement strategies for attracting civilians. Our unique approach and business model are highly effective and we hope to return to higher overall growth rates when military deployments and activity settles and as our civilian student population scales to be the primary driver of our growth rate.

In the above statements, APEI discloses newly-discovered information adversely affecting its growth in net course registrations from active duty miliary students at AMU. While APEI does not purport to know the exact cause of this shift, it provides numerous examples of the more plausible cause; that is, increased military deployments. These are all simply market risks which are clearly beyond APEI's control. At no time, however, does it give any credence to the Class Plaintiff's theory regarding a changing competitive landscape in response to the 90-10 Rule. Further, APEI responsibly acknowledges that it cannot predict when these military personnel will return. Therefore, it withdrew any future guidance. Additionally, APEI noted that it would have to adapt by accelerating its existing

strategic plan to grow its civilian segment through its APU.

Wilkins then stated (Compl. ¶ 95):

If you move to slide seven, which shows our Third Quarter Outlook. As Wally indicated previously, we have recently observed that the growth of our net course registrations from active duty military student has slowed more than we expected. We believe that this may be due to increased operations, military activity and recent overseas deployments. Thus we expect slower growth in net course registrations in revenue.

As illustrated on slide seven, we expect net course registrations to grow between 20% and 22% in the third quarter of 2010. Revenues are anticipated to increase between 29% and 31% during the quarter, driven primarily by the increase in overall net course registrations and the timing of the starts in June.

Net course registration growth from active duty military students declined to approximately a flat percentage year-over-year in July, and similarly in August.  As the growth of active duty military students continued as previously expected, our overall outlook for net course registration growth and revenues would have remained unchanged or in the mid-30s for the full year.

As a result of the adverse changes in the pattern of growth in active duty military registrations, we have been increasing our marketing spend to increase civilian registrations at a faster rate than we had originally planned. At the same time, we expect our faculty expenses and student support cost to increase in preparation for the possibility of expanded future enrollment related to the Walmart partnership.

Importantly, in the question and answer session during the August 5, 2010,

33

conference call, when the question was posed why the defendants believed that "this deployment is the cause for the surprise and not a loss of market share, increased competition that folks have been speculating about for some time," Boston responded (Compl. ¶ 96):

> Well, thanks, Trace. I think, as you might know, we did quite a bit of analysis. We track our enrollments by military base and we look at the changes in those enrollments up and down. **And when you look at where we have seen decreased enrollments in the last month and where we forecast decreased enrollments for the third quarter, it's at bases where a substantial portion of the force has been deployed.**
>
> **So, for example, in the Marine Corps, Camp Lejeune and the base on the West Coast, which I'll think of in a second, are the two largest Marine Corps bases and both of those bases are, as some of the local merchants tell us, almost like ghost towns with the marines in Afghanistan for this current surge.**
>
> So the Marine Corps is where we have our largest market share as a percentage of their students were studying in higher ed and we have their two largest bases, which are currently very actively deployed. But we've looked around and we've checked other sources that services only publish their enrollment data on an annual basis, but from some unofficial conversations, we don't believe that this particular situation is limited to us. In our particular situation, since we're number one with the largest market share and the only public company reporting that data, the one you see might be another guess, if you could obtain data from them that we believe that this is entirely due to the most deployment not just Afghanistan, Iraq where if you take the March 25 article in the Washington Post, the number of forces combined in Afghanistan or Iraq now exceed the maximum during the peak of the Iraq war, as well as we have soldiers in Kuwait who are taking down

equipment and either refurbishing it for shipment to Afghanistan or shipment elsewhere.

And then we have the small matter with the two naval exercises, one off the coast of South Korea, which is due to the simmering situation with North Korea and then the other one, which was a regularly scheduled multi-nation exercise. But in both of those cases with the naval forces, when they're out of sea they don't communicate, they maintain radio silence and their Internet connections are very limited. So all in all, it's sort of a conflagration of a number of events. And we think it's temporary, we just can't predict when it might recover.

(emphasis added).

This Court finds two statements which are not only *not* misleading, but represent the most tangible facts to support one of the opposing theories.  This Court finds the statements support APEI's inference that increased deployments caused the decline in military course registrations.  First, Boston states that the two largest Marine Corps bases in the country are like ghost towns due to deployments.  This fact indisputably supports APEI's inference that these military deployments are a substantial cause of the decline in net course registrations at AMU.  The second statement is contained in the proceeding paragraph.

During the same August 5 call, an analyst questioned as to "when you found out about the slowdown in the military side of your growth" (Compl. ¶ 97):

Arvind Bhatia, Sterne Agee: At that point, I guess, as you started to reevaluate your growth, was there discussion internally to communicate the change at that point to the Street or were you seeing some signs that things could get better? What I'm trying to understand is, has there been further

deterioration since June or things have been kind of flattish after that?

Boston: I think that one of the things that's different about our military students and our civilian students all along is that our civilian students will register about 45 days out because of the intricacies of getting the FSA approved, whereas our military students will see a heavy enrollment typically in the last two to three weeks before semester starts really based on their assignments.

And so we were well into June or we were past the drops for the month of June when we were looking at July registrations and realizing that we weren't seeing a typical last-minute influx of students for July both returning and new, and we're now into August and we didn't see much for August either. So that's why we gave this guidance and we obviously did a bunch of research into which bases were impacted and what the ops' tempo were at those bases and it's going to be tough to predict. I mean the President says that the troops will be out of Iraq by August 31. Who knows what that means and who knows if that is -- if that can be accomplished.

Boston credibly explains the difficulties of predicting military enrollment when he states: "our military students will see a heavy enrollment typically in the last two to three weeks before semester starts really based on their assignments." Thus, this highly unpredictable military segment has an inherent risk that enrollments could decline significantly at any time, and with little notice. This Court does not find that this should preclude APEI from making projections for that reason. Rather, what APEI did was base future projections on its historical growth and monitor and report any changes thereto. This Court, therefore does not find such statements to that effect to be misleading or fraudulent.

In conclusion, in ascertaining whether the Complaint has stated *sufficient facts* to

permit a *reasonable* person to find that the Class Plaintiffs have satisfied the element that the defendants made false or misleading statements, this Court finds the Complaint falls short.  *See Teachers'*, 477 F.3d at 173.

**2.    *Scienter***

**I.**

The PSLRA imposes a number of requirements designed to discourage private securities actions lacking merit.  Among them is the requirement that in a private securities action "in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to **a strong inference** that the defendant acted with the required state of mind."   15 U.S.C § 78u–4(b)(2) (emphasis added).  Complaints that do not adequately plead scienter are to be dismissed. Id. at § 78u–4(b)(3)(A).  "And if the defendant is a corporation, the plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation, since corporate liability derives from the actions of its agents.  *See Tallabs, Inc.*, 437 F.3d at 602-03; *Southland Sec. Corp.*, 365 F.3d at 363-67." *Teachers' Ret.*, 477 F.3d 162, 184.

The PSLRA does not define what constitutes "a strong inference;" however, the Supreme Court has provided guidance.  *See Tellabs, Inc.*, 437 F.3d 588, 601 (listing approaches of different circuits), *vacated and remanded*, 551 U.S. 308.  In *Tellabs*, the Court prescribed the following analysis for Rule 12(b)(6) motions to dismiss § 10(b) actions:

> *First*, . . . courts must, as with any motion to dismiss for failure to plead

a claim on which relief can be granted, accept all factual allegations in the complaint as true . . .

*Second*, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss . . ..  The inquiry, as several Courts of Appeals have recognized, is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.

*Third*, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences . . ..  The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative:  How likely is it that one conclusion, as compared to others, follows from the underlying facts? . . ..  [T]he inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations.  A complaint will survive, we hold, <u>only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged</u>.

***Tellabs***, 551 U.S. at 322-325 (emphasis added).

This Court has conducted a complete analysis of all alleged statements and inferences that can be drawn from the Amended Complaint and the parties' briefs and finds that, "tak[ing] into account plausible opposing inferences . . . a reasonable person would deem the [Class Plaintiffs'] inference of scienter [is not] cogent and at least as compelling

38

as the opposing inference one could draw from [the] facts alleged." ***Id***. Rather, the Class Plaintiffs' Amended Complaint lacks "a strong inference that the defendant acted with the required state of mind" as proscribed by 15 U.S.C. § 78u–4(b)(2), and as construed by the United States Supreme Court. ***Id***. Specifically, this Court finds that the defendants' opposing inference is more compelling than that offered by the Class Plaintiffs.

### A.    The Class Plaintiffs' Inference

Here, the Class Plaintiffs' theory turns on its position that APEI misled the market regarding its military market share.  Specifically, plaintiffs allege that competitors began recognizing the opportunity to avoid violating the 90-10 Rule afforded them by active-duty military personnel and veteran students – as well as the increased funding made available by the Post-9/11 GI Bill.  Thus, APEI's for-profit competitors began aggressively pursuing military and veteran students prior to and during the Class Period in an effort to bolster the 10% side of the 90-10 calculus.  Id. at ¶ 51.  As a result, the plaintiffs allege that the defendants were aware of, or deliberately disregarded, that APEI's market-leading position in the military for-profit education segment was under fire during the Class Period.  Id. at ¶ 52.  The result, plaintiffs allege, was that rising competition for military students dragged down APEI's ability to grow military course registrations.

To that end, while the rate of growth for APEI's total military educational benefits received decreased every year, the vast majority of its competitors increased, especially during 2009 and 2010, when the increases were frequently by several hundred, or even several thousand, percent.  Id. at ¶ 57.  APEI realized only a 15% increase in DOD benefits received in 2010, compared to 2009, which was down from a 31% gain in 2009, and a 53%

increase in 2008.  Id.  The plaintiffs allege that the defendants were keenly aware that the decline of APEI's military-based enrollment was not merely a future potential risk, but was an actual, present reality.

The alleged misleading statements first began on February 22, 2010, when "APEI touted its status as the largest provider of higher education to active duty military recruits, without disclosing changes to the competitive landscape and that its financials and future business prospects were not sustainable."  Id. at ¶¶ 62-63.  Class Plaintiffs allege that despite the problems impacting APEI's business, defendants assured the market that APEI would continue to grow.  APEI also provided outlook for the year 2010, which included a 35-38% increase in net course registrations year-over-year and estimated that net course registrations would increase 32-35% for 2011. Id. at ¶ 62.  APEI also reassured the market that APEI stayed informed of any significant military deployments and built deployments into its guidance. Id. at ¶ 64.  Similarly, on May 6, 2010, APEI reiterated its 2010 guidance for revenue growth and net course registrations and increased its net income guidance to between 36% and 39% year-over-year.  Id. at ¶ 76.

Three months later, on August 5, 2010, APEI downgraded its revenue and earnings guidance for the third quarter of 2010, and withdrew its guidance for year 2010.  Id. at ¶ 93. APEI revealed "adverse changes" in net course registrations of its active duty military students at AMU as a result of increased deployments and announced plans to increase APEI's focus on the civilian market, rather than the military market.  Id. at ¶ 94.  In response to this news, the price of APEI stock significantly decreased by 32%. Id. at ¶ 104.

Indeed, APEI even asserted that it was gaining "actual share inside the military" and experiencing "continued expansion."  Id. at ¶¶ 65-66.  Despite this alleged attack on its

40

market share, APEI specifically addressed the issue, stating: "there has been no change in the competitive environment within the military segment despite concerns that other for-profits would step up their efforts in this market to thwart the 90-10 issues." Id. at ¶¶ 11, 73.

### B.    The Defendants' Inference

Defendants assert that increased competition was not the cause of the declining enrollments.  Rather, they contend their withdrawal of the previous guidance was a result of unforseen, temporary market factors, which upon discovery, were timely disclosed. Such factors included increased oversees military deployments and the increased Government probes, which indeed, affected the entire for-profit education sector.  The defendants point out that their company continues to grow and, with the exception of one quarter, has met its projections.  These facts have led the defendants to pose an interesting question which tends to undermine the plaintiffs' inference: If APEI's market share was adversely impacted by increased competition for one quarter, what explanation can the Class Plaintiffs offer regarding the subsequent lack of adverse impact in each quarter to follow?  This Court finds no compelling explanation.

The more compelling rationale posed by the defendants includes the assertion that they had built into their projections the possibility of increased deployments and withdrew their third quarter guidance as a result.  To rebut the Class Plaintiffs' inference that the defendants "must have known" the statements issued regarding its competition were misleading, APEI contends the same is inadequate to withstand the heightened pleading requirements required by the PLSRA.  Specifically, APEI argues that the Class Plaintiffs ask this Court to draw the inference that APEI knew that this alleged increase in

competition had fundamentally altered APEI's competitive advantage, yet chose to remain silent.  The fact remains that APEI continued to meet its guidance when these statements were made.  Further, APEI cogently argues that the plaintiffs contradict their inference by asking this Court to draw the above inference despite the fact that: (1) APEI saw declining enrollments in a single quarter; (2) APEI thereafter met its projections, causing its stock price to rebound; and (3) APEI derived no benefit from any alleged fraud.  Specifically, APEI stated:

> American Public Education has recently observed adverse changes in our historical pattern of growth in net course registrations from active duty military students at AMU. While the Company cannot determine all of the factors that are causing it to occur, American Public Education believes the changes in net course registrations from active duty military students may in part be due to increased operations activity and recent deployments across all branches of the U.S. Military, particularly the United States Marine Corps. The Company believes that increased demands on many active duty military personnel, combined with limited internet access associated with some deployments in Afghanistan and at sea, are likely to limit the ability of certain active duty military students to pursue higher education in the near term.  The Company cannot determine whether net course registrations from active duty military students will return to previous expectations, grow more slowly than expected, remain flat or decline.
>
> As a result, American Public University Systems plans to accelerate its existing strategic plan to address civilian markets through APU, with an emphasis on public service professionals and selected groups of working adults.

In reality, APEI argues, it did disclose to the market a decline in enrollments as a

42

result of temporary factors including increased deployments and, upon these discoveries, it immediately withdrew its previous guidance. After the storm passed, APEI's business essentially emerged unscathed. It is, thus, the inference of APEI's non-fraudulent intent overwhelmingly outweighs the inference of fraudulent intent offered by the Class Plaintiffs. Accordingly, APEI seeks dismissal on the ground that the Class Plaintiffs have not adequately alleged scienter. APEI asserts the above is more consistent with an unforeseeable, temporary change in market demand rather than a fundamental adverse change in its overall competitive landscape. Essentially, the defendants argue that the Class Plaintiffs are "complaining only about market risks, not particularized securities fraud." *Teachers' Ret.*, 477 F.3d at 168.

### C. Court's Comparison of the Parties' Opposing Inferences

The Supreme Court has provided guidance in determining whether the pleaded facts give rise to a "strong" inference of scienter. Simply put, "the court must take into account plausible opposing inferences . . .. The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? . . .. [T]he inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive . . . **only if** a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 322-325 (emphasis added). In addition, "[i]n making this determination, the court must review 'all the allegations holistically.'" *Matrixx*, 131 S.Ct. at 1324 (quoting *Tellabs*, 551 U.S. at 326).

43

Importantly, this Court finds the Amended Complaint devoid of any facts regarding any specific institutions actually in jeopardy of "running afoul of the 90-10 Rule." This Court reiterates that perhaps the most compelling fact which belies the Class Plaintiffs' inference regarding the fundamental change in APEI's competitive landscape in the military segment comes from the August 4, 2010, reports from the GAO which for the first time revealed that APEI's competitors had been aggressively targeting military personnel through deceptive recruiting practices. The GAO did not disclose the extent to which these deceptive recruitment activities were successful; however, it shows that knowledge of the competitive encroachment on the military segment was not revealed until August. Thus, this Court finds the defendants' inference more compelling than the Class Plaintiffs'.

## II.

In addition, other facts stated in the Amended Complaint are too circumstantial to give rise to a "strong inference that the defendants acted with scienter. The [Amended] Complaint suggests that the defendants artificially inflated [APEI's] share price in order to profit from personal sales of [its] stock. But insider trading can imply scienter only if the timing and amount of a defendant's trading were 'unusual or suspicious.'" *Teachers' Ret.*, 477 F.3d at 184. This Court has reviewed the timing of the trades and finds that the Amended Complaint falls far short of showing that the trades were made at a time consistent with knowing or reckless fraud. Rather, these sales follow a rather simple pattern based on the date and number of shares sold. For Boston, it appears his plan essentially set sales to occur on the 15th of the month, unless it fell on a weekend, in which

44

case the sale was made the next business day.  Compl. at ¶ 110.  For Wilkins, trades were made bi-monthly in the amounts of 500 or 2,000 shares.

Finally, the Amended Complaint does not allege that the defendants timed their sales to profit from any particular disclosure; rather the defendants' sales were made pursuant to previously established 10b5-1 trading plans.  Additionally, the Amended Complaint does not provide defendants' trading patterns outside the class period to permit comparison with their trades within the class period.  See *Teachers' Ret.* at 185.

### 3.   Class Plaintiffs' Claims Fall Short of Establishing a Causal Link Between the Alleged Fraud and the Claimed Loss

Claims for securities fraud under § 10b and 10b-5 require that the Class Plaintiffs must "allege a sufficiently direct relationship between the plaintiffs['] economic loss [– in this case, the dimunition of the value of the stock shares –] and the defendants['] fraudulent conduct."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005).  In the Fourth Circuit, the Court "review[s] allegations of loss causation for 'sufficient specificity,' a standard largely consonant with Fed. R. Civ. P. 9(b)'s requirement that averments of fraud be pled with particularity.[3]  The degree of specificity demanded is that which will enable the court to evaluate whether the necessary causal link exists."  *See Katyle*, 2011 WL 857144 at *6 (2011).  Accordingly, where "the connection is not attenuated, a fraud claim will not lie."  *Dura Pharm.*, 544 U.S. at 337 (citing *Miller v. Asensio & Co.*, 364 F.3d 223, 232 (4th Cir. 2004)).  And, mere "[s]peculation and conjecture, even a well-educated guess, in the

---

[3] The heightened pleading standards of the PLSRA do not carry over to causation. "Congress only addressed misrepresentations and scienter in § 78u-4(b)."  *Teachers' Ret.*, 477 F.3d at 172.  As such, the other elements of a securities fraud claim are analyzed under the traditional pleading scheme of Rules 8 and 9.

context of market prognostication does not suffice to establish a fact" that adequately supports a plaintiff's loss causation allegation. *Id.* at *11. In addition, in any private action arising under the PSLRA, "the plaintiff[s] shall have the burden of proving that the act or omission of the defendant[s] alleged caused the loss for which the plaintiff[s] seek to recover damages." ***Teachers'*** at 185. Further, "because the PSLRA explicitly requires that the plaintiff[s] prove loss causation, the general rules of pleading require that the plaintiff[s] also plead it in [their] complaint." *Id.* (citing ***Dura Pharm.***, 544 U.S. at 346). The Fourth Circuit ***Teachers'*** case continues:

> Neither the PSLRA nor the Supreme Court has established whether loss causation is a sufficient part of an "averment of fraud" to fall within the requirements of Federal Rule of Civil Procedure 9(b). A strong case can be made that because loss causation is among the "circumstances constituting fraud for which Rule 9(b) demands particularity, loss causation should be pleaded with particularity." *See* ***Dura Pharm.***, 544 U.S. at 343–44 (comparing § 78u–4(b)(4) to a common law action for deceit which requires that a plaintiff "show not only that he had known the truth he would not have acted but also that he suffered actual economic loss"); ***Miller v. Asensio & Co., Inc.***, 364 F.3d 223, 231–32 (4th Cir. 2004) (explaining loss causation to require a showing that "defendant's misrepresentation was a substantial cause of the loss by showing 'a direct or proximate relationship between the loss and the misrepresentation.'" (quoting ***Gasner v. Bd. of Supervisors***, 103 F.3d 351, 360 (4th Cir. 1996))). Moreover, the Supreme Court has not ruled out a holding that Rule 9(b) governs a pleading of loss causation. *See* ***Dura Pharm.***, 544 U.S. at 346.

Even in the absence of an explicit holding, the ***Dura Pharmaceuticals*** Court concluded that a plaintiff does not state a claim upon which relief can be granted—even under the relaxed pleading requirements of Rule 8(a)—by

simply alleging that the plaintiff purchased defendant's stock at an "artificially inflated purchase price" and thereby sustained damages. *Id*. at 347. The Court required something more, stating:

> We concede that ordinary pleading rules are not meant to impose a great burden upon a plaintiff. But it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind. At the same time, allowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about the harm of the very sort that the [PSLRA] seek[s] to avoid. *Id*. at 347 (citations omitted). A failure to recognize that loss causation be specifically alleged and demonstrated by the allegations of the complaint would permit a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the discovery process will reveal relevant evidence. Such a rule would tend to transform a private securities action into a partial downside insurance policy. *Id*. at 347–48 (internal quotation marks and citations omitted).

> Accordingly, we conclude that a plaintiff purporting to allege a securities fraud claim must not only prove loss causation—that the material misrepresentations or omissions alleged actually caused the loss for which the plaintiff seeks damages—but he must also plead it with sufficient specificity to enable the court to evaluate whether the necessary causal link exists. *See **Lentell v. Merrill Lynch & Co.***, 396 F.3d 161, 172 (2d Cir. 2005).

***Teachers'***, 477 F.3d at 185-186.

"To allege loss causation in this case, plaintiffs would have to allege that the market reacted to new facts disclosed [on August 5] that revealed [APEI's] previous

47

representations to have been fraudulent." *Id*. at 187.  In this case, the Class Plaintiffs allege the discovery by the market of increased competition in the military education market caused APEI's stock price to decline.  Plaintiffs' theory rests on the defendants' alleged concealment of this fact, which APEI has neither admitted, nor has it ever released any corrective disclosure relating to this fact.  Simply, the Class Plaintiffs speculate that the defendants concealed information regarding increased competition which caused APEI to miss its earnings projections, thereby causing the plaintiffs' economic loss.  Because no such disclosure occurred, the drop in APEI's share price on August 6, 2010, more logically occurred because APEI released adverse information regarding a decline in military enrollments due to increased military deployments.  *See Id*. at 187-88.  "That loss, however, is not one for which the plaintiffs in this case are entitled to compensation." *Id*.

To drive this point home, the *Teachers'* Court concludes its opinion with an "epilogue," wherein it states that "it appears that the market reached the same conclusion regarding plaintiffs' allegations.  The record shows that although [the defendant's] share price dropped . . . the price recovered quickly," returning nearly to its previous level.  This is precisely what happened in this case.  After a one-quarter dip in APEI's stock price in the third quarter upon the news of the deployments, the share price rebounded and remains strong to this day.

## B.      Section 20(a) Controlling Person Liability

Section 20(a) of the Exchange Act provides for liability for "controlling persons."  15 U.S.C. § 78t.  However, "controlling person liability is premised on an independent violation of the federal securities laws." *Merck*, 432 F.3d at 275 (citations omitted).  Because the

plaintiffs have failed to show an independent violation of the federal securities laws, they likewise cannot maintain a claim for controlling person liability.  Accordingly, Count II must also be **DISMISSED**.

### C.     Dismissal With Prejudice is Appropriate in this Case

Finally, the Class Plaintiffs request leave to amend the Amended Complaint in the event of dismissal.  To grant leave to amend "until [plaintiffs] get it right" would be contrary to the purpose of the PSLRA's "high standard of pleading," the purpose of which is to "provide a filter at the earliest stage to screen out lawsuits that have no factual basis . . .." *Smith v. Circuit Stores*, 286 F.Supp.2d 707, 722 (E.D. Va. 2003).  Indeed, 15 U.S.C. § 78u-4(b)(3) states that "the court shall, on the motion of any defendant, dismiss the complaint if the [pleading] requirements are not met."  The Court of Appeals for the Third Circuit in *GSC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004), held that when a "stark absence of any suggestion by the plaintiffs that they have developed facts since the action was commenced which would, if true, cure the defects in the pleadings under the heightened requirements of the PSLRA," a complaint should be dismissed with prejudice.  This Court has already given the Class Plaintiffs the opportunity to amend their complaint once.   Further "amendment would be futile in light of the fundamental deficiencies in [the] plaintiffs' theory of liability . . .." *Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 630-631 (4th Cir. 2008).

## V.     Conclusion

Therefore, based on the reasons stated above, this Court is of the opinion that the Motion to Dismiss by Defendants American Public Education, Inc., Wallace E. Boston, Jr.,

and Harry T. Wilkins **[Doc. 59]** should be, and the same is, hereby **GRANTED**. Accordingly, this matter is hereby **DISMISSED WITH PREJUDICE** and **ORDERED STRICKEN** from the active docket of this Court.  The Clerk is further **DIRECTED** to enter a separate judgment in favor of the defendants.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED**: December 8, 2011.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE